**Paul Peter SOLINA, Jr.,
Petitioner-Appellant,**

v.

**UNITED STATES of America,
Respondent-Appellee.**

**No. 1146, Docket 82–2389.**

United States Court of Appeals,
Second Circuit.

Argued April 19, 1983.

Decided June 3, 1983.

---

Stephanie Kearns, Atlanta, Ga. (Crew, Kearns & Blackwood, Atlanta, Ga.), for petitioner-appellant.

Jane Simkin Smith, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y.) Brooklyn, N.Y., for respondent-appellee.

Before FRIENDLY, WINTER and PRATT, Circuit Judges.

FRIENDLY, Circuit Judge:

Paul Peter Solina, Jr., was convicted on April 14, 1971, on one count of bank robbery in violation of 18 U.S.C. § 2113(d), in the District Court for the Eastern District of New York after trial before Judge Mishler and a jury and was given the maximum sentence of 25 years imprisonment. Solina now appeals from the same judge's denial, after a hearing, of a motion pursuant to 28 U.S.C. § 2255 to vacate the conviction and for a new trial. The ground of Solina's motion was that he had been represented, at trial and on the appeal wherein we affirmed the conviction, *United States v. Marshall,* 458 F.2d 446 (2 Cir.1972), by one Walter T. Coleman, who posed as a lawyer but who, although holding a Bachelor of Law degree from an accredited law school, had not, despite two attempts, passed the New York State bar examination, for that reason had not become a member of the New York bar, and was not a member of any other bar. Recognizing that Solina had neither enjoyed nor waived the "assistance of counsel" to which he was entitled under the Sixth Amendment, the judge denied the motion in a reasoned opinion because, after taking Coleman's testimony and carefully scrutinizing the record, he concluded that Solina had not been prejudiced by Coleman's not being a licensed attorney and thus, although the opinion did not use the precise words, that the lack of licensed counsel was harmless beyond a reasonable doubt within the meaning of *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), and *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969). This conclusion was based upon a number of factors: that Coleman had a legal education; that

he had experience in examining and cross-examining witnesses before administrative agencies; that the evidence of Solina's guilt was overwhelming; that examination of the 14 instances of ineffectiveness alleged by Solina's present counsel showed that these were inconsequential or within the permissible range of professional judgment; and thus that Solina had received representation from Coleman which met not only the standard applied by this circuit in cases involving the alleged incompetency of counsel, *United States v. Wight,* 176 F.2d 376 (2 Cir.1949) (conduct not so deficient "as to shock the conscience of the Court and make the proceedings a farce and mockery of justice"), *cert. denied,* 338 U.S. 950, 70 S.Ct. 478, 94 L.Ed. 586 (1950), but also the higher standard set forth in *United States v. De-Coster,* 487 F.2d 1197, 1202 (D.C.Cir.1973) ("reasonably competent assistance of an attorney acting as his diligent and conscientious advocate") and now generally followed in other circuits.

Coleman's testimony revealed the following: He was graduated from Fordham College in 1941, and in his final year of college worked as a law librarian at the Bronx County Bar Association Law Library. Coleman continued this employment while he attended Fordham Law School for part of 1941, after which he left to join the Naval Air Corps. At the end of World War II he was employed as a pilot training instructor for Pan American Airways, eventually becoming a representative of its ground employees' union. He returned to Fordham Law School in 1955 and 1956, enrolling in the evening program to complete one year's credit. In 1956 he transferred to the evening program of New York Law School, like Fordham an accredited law school, in order to take advantage of that program's summer session. Coleman received an LL.B. degree from New York Law School in 1958. He attempted the New York State Bar examination in 1959 and failed. He tried again in 1960, and this time passed the substantive law part but failed the procedural part. Coleman never took the bar examination again and was never admitted to practice law in any state.

From 1955 to 1971, Coleman handled an estimated 1000 labor cases before arbitration panels of the National Labor Relations Board and an equivalent number of matters before units of the National Mediation Board. His earliest labor law experience was gained by representing Pan American Airways employees in arbitration matters. Then, for a year and a half beginning in 1964, he was a full-time assistant to a lawyer representing management in labor matters; in this capacity Coleman helped to prepare for court appearances and sometimes sat at the counsel table. In 1965 or 1966 Coleman became Executive Director of the Long Island Restaurant & Caterers Association. His duties in that position included representing management in arbitrations with the Hotel and Restaurant Employees and Bartenders International Union. Although in administrative proceedings Coleman had offered evidence and cross-examined witnesses, prior to his 1971 representation of Solina he had never represented anyone or appeared on his own behalf in any motion or civil or criminal trial in state or federal court.

Coleman's legal education had included introductory courses in criminal law in 1941 and 1955 at Fordham, and an elective course on that subject at New York Law School. He also took a course in federal practice and participated in a clinical program at New York Law School. After 1958 he attended four Practicing Law Institute seminars on labor law but took no further courses in criminal law. Coleman testified that his reading of the *Wall Street Journal* and *New York Times* during the 1960's gave him what familiarity he had with the "more notorious" of the landmark decisions on criminal procedure. He stated that while in a law library doing labor law research he might have occasionally looked up current cases on criminal law.

Coleman met Robert Marshall, who was to be one of Solina's co-defendants in the bank robbery indictment, before he met Solina. Marshall retained Coleman to represent Solina, who was then out on bail on an earlier bank robbery charge. The fol-

lowing day, October 21, 1970, Solina, Marshall, and John Joseph Guglielmo, were arrested for the robbery on that day of the Security National Bank in Copiague, New York. The record does not disclose who was to pay Coleman. Both Marshall and Solina assumed that Coleman was a duly licensed attorney; Coleman did nothing to disabuse them of this assumption during the trial and appeal. On August 10, 1981, Coleman was convicted on a plea of guilty to practicing law without a license. Solina first learned of Coleman's unlicensed status from reading a newspaper report of this and subsequently made the motion here at issue.

The evidence of Solina's guilt was indeed overwhelming. As stated in Judge Mishler's opinion:

At the trial, three bank employees identified Solina as one of the two men who entered the bank and committed the robbery. A bank teller testified that one of the robbers (identified as Solina) cut his hand when glass in the teller's cage shattered as the robber jumped over the counter. Solina was arrested with his two co-defendants while fleeing from their overturned car after a high-speed chase following the robbery. One of the police officers involved in the chase identified Solina at the trial as a passenger in the car. Stolen money, bank books, "bait" money, various items used in the robbery (clothing, wigs, glasses, walkietalkies) and one of Solina's shoes were recovered by the police from the overturned car. The shoe had particles of glass embedded in the sole. The glasses had the letters "S-o-l-i-n-a" on the ear piece. Laboratory analysis was offered showing that Solina's blood and clothing fibers were of the same type as those found in the bank and that Solina's heel print matched the print found on the bank counter. The glass embedded in the bottom of Solina's shoe was found to be of the same type as glass samples taken from the bank. At the time of his arrest, Solina had car keys in his pocket for a car owned by Marshall. (A car that was not used in the robbery). The government introduced the keys as evidence at the trial to indicate Solina's relationship with Marshall prior to the robbery.[1]

Solina's defense, voiced through two witnesses but almost fated to be unconvincing in light of the circumstantial evidence offered by the prosecution, was that his arrest had been based on mistaken identity; that he had never met his co-defendants until the date of their arrest; and that he had been elsewhere in Long Island at the time of the robbery and, by coincidence, had been driven to the area where the getaway car overturned and dropped off at the side of the road just before the arrests were made.

The district court found that Coleman had met with Solina several times prior to and had conferred regularly with him during the trial.[2] He also had conferred with the experienced attorneys who represented the two co-defendants and often joined in motions made by them. He made a brief opening statement, cross-examined those of

---

1. At the close of the trial, as the jury was discharged, the judge stated:

I can't recall a case so heavily weighted against the defendants as this one was. The evidence was just overwhelming.

This court quoted this remark in its opinion on appeal, *supra*, 458 F.2d at 447, n. 1, and agreed in characterizing the evidence against the defendants as "overwhelming", 458 F.2d at 452.

2. Shortly before the close of the trial, Solina, adopting a tactic that had been used by his co-defendant Guglielmo, abruptly stated that he no longer wished Coleman to represent him. Coleman immediately requested that the court relieve him. Instead the court directed him to remain at Solina's side as an adviser. In fact his representation seems to have been largely unaffected. Although Solina addressed the court from time to time, Coleman continued to attend bench conferences and to join on Solina's behalf in motions by other counsel, and delivered a summation with Solina's tacit approval. He also appeared for Solina in this court. The Government does not contend that Solina's temporary rejection of Coleman constituted a waiver, and Solina's present counsel does not contend that the district court's direction that Coleman remain at the counsel table constituted an appointment. We attach no importance to either event.

the Government's witnesses who identified Solina as one of the perpetrators, examined Solina's two alibi witnesses, and delivered in summation what the judge characterized as "a carefully reasoned attack on the eyewitness testimony". The effect of Coleman's summation was blunted, through no fault of his, when Solina's co-defendant Guglielmo interrupted it by slashing his wrist and causing the courtroom to be cleared. On appeal Coleman joined with the seasoned defense lawyer representing Marshall in pitching his case for reversal on the alleged prejudicial effect of this and other highly disruptive actions of Guglielmo described in our opinion, 458 F.2d at 448–49. There is no claim that taking this course was an error of judgment. We rejected the claims that the judge should have directed a mistrial or granted a severance under F.R. Cr.P. 14, but there is nothing to indicate that the most accomplished lawyer could have prevailed. We agree with Judge Mishler that the fourteen criticisms developed by Solina's present counsel are a long way from establishing that Coleman did not furnish Solina with reasonably competent representation. We agree also that nothing in the record supports a belief that a lawyer licensed to practice in every state of the Union could have presented a case that should have induced a rational juror to harbor a reasonable doubt about Solina's guilt. To close the circle, the Government submitted an affidavit of the Assistant United States Attorney who had been in charge of the trial stating that he had no recollection of having been prepared to offer Solina a plea to a reduced charge carrying a lesser sentence and did not believe he would have

done so under any circumstances in light of the seriousness of the offense, the strength of the evidence, and the extent of Solina's prior criminal record.[3] Although Judge Mishler's opinion does not speak directly to the question, he obviously did not think the most heavily licensed lawyer could have persuaded him to impose a sentence less than the maximum.[4]

If a harmless error rule were applicable in cases like this, as the district judge thought, the standard would have to be set very high. As in the case of joint representation, representation by a person not licensed to practice law "is suspect because of what it tends to prevent the ['] attorney['] from doing". *Holloway v. Arkansas,* 435 U.S. 475, 489–90, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978).[5] The problem of representation by a person like Coleman is not simply one of competence—he may very well have had greater competence to represent a defendant in a criminal trial than some leaders of the profession who are expert in corporate financing or estate planning but have never examined or cross-examined a witness—but that he was engaging in a crime.[6] Such a person cannot be wholly free from fear of what might happen if a vigorous defense should lead the prosecutor or the trial judge to inquire into his background and discover his lack of credentials. Yet a criminal defendant is entitled to be represented by someone free from such constraints. Moreover, Coleman, who was retained and may have been paid by Marshall, was not likely to have been any more sensitive to his duty of undivided loyalty to Solina than he was to his duty

**3.** This included four prior convictions and nine prior arrests for theft or dangerous weapons. Solina was also a suspect in other 1970 Suffolk County bank robberies.

**4.** In addition to the factors mentioned in note 3, Solina had attempted to escape while awaiting trial and had himself endeavored to disrupt the trial on more than one occasion.

**5.** Chief Justice Burger amplified this, 435 U.S. at 490, 98 S.Ct. at 1181:
But in a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to

*refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. (Emphasis in original).

**6.** In New York, practicing or appearing as an attorney-at-law for a person other than oneself and receiving compensation for such practice or appearance in any court in the state "without having first been duly and regularly licensed and admitted to practice law in the courts of record of this state" are misdemeanors under N.Y.Judic.Law §§ 478, 484 (McKinney 1983).

not to undertake representation in a criminal proceeding. In other circumstances, this consideration would have considerable force, for a co-defendant's interest in a colleague's defense is all too likely to be a fear that he will seek leniency in exchange for testimony. However, the evidence against Marshall was also hopelessly overwhelming and the Government had little incentive to seek Solina's cooperation. Whatever force such considerations may have in other circumstances, therefore, the facts of this case make them more theoretical than real. There is simply nothing to suggest that a licensed lawyer for Solina could have arrived at a plea bargain, provided a single juror with a rational basis for having a reasonable doubt, induced the judge to impose a lesser sentence, or prevailed upon appeal, and everything to indicate that he could not. See *United States v. Katz,* 425 F.2d 928, 930 (2 Cir.1970). We thus would affirm the district court's denial of the motion on the ground of error harmless beyond a reasonable doubt, *Chapman v. California, supra,* 386 U.S. at 24, 87 S.Ct. at 828, if that course were open to us. See *United States v. Hastings,* —— U.S. ——, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).

Before considering whether it is, we should deal with two arguments that might be made to show that there was no error at all. One, which the Government was well advised not to advance but still deserves mention, would be that the assistance of counsel clause of the Sixth Amendment is not implicated since we are dealing not with assigned counsel but with counsel retained by the defendant. The Bill of Rights was adopted, it could be argued, to "take government off the backs of people", *Schneider v. Smith,* 390 U.S. 17, 25, 88 S.Ct. 682, 686, 19 L.Ed.2d 799 (1968) (Douglas, J.). It should come into play, e.g., when the court refuses to appoint counsel to represent an indigent, as in *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), or forces upon him a lawyer to whom he objects on the ground of conflict of interest, as in *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), but not to protect a defendant from his own failure to check the professional standing of his freely chosen representative. Here the United States had nothing to do with Solina's selection of Coleman; no more than Solina did the prosecutor or the judge know that Coleman lacked a license to practice law. In the not too distant past, cases involving the claimed incompetency of counsel sometimes turned on a distinction of this sort. See, e.g., *Fitzgerald v. Estelle,* 505 F.2d 1334, 1336–37 (5 Cir.1974) (en banc), *cert. denied,* 422 U.S. 1011, 95 S.Ct. 2636, 45 L.Ed.2d 675 (1975), in which a majority of 11 held that although the state was responsible when "a lawyer's ineffectiveness has rendered a trial fundamentally unfair, whether he be retained or appointed", it was not when retained counsel had simply failed to meet the Sixth Amendment's standard of effectiveness, with five judges voting to hold the latter also to be a violation. However, any distinction between retained and assigned counsel for purposes of the Sixth Amendment seems to have been swept from the boards by *Cuyler v. Sullivan,* 446 U.S. 335, 344–45, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980), where the Court said:

> A proper respect for the Sixth Amendment disarms petitioner's contention that defendants who retain their own lawyers are entitled to less protection than defendants for whom the State appoints counsel.... The vital guarantee of the Sixth Amendment would stand for little if the often uninformed decision to retain a particular lawyer could reduce or forfeit the defendant's entitlement to constitutional protection. Since the State's conduct of a criminal trial itself implicates the State in the defendant's conviction, we see no basis for drawing a distinction between retained and appointed counsel that would deny equal justice to defendants who must choose their own lawyers. [Footnotes omitted].

Refusal to distinguish between retained and assigned counsel seems also to be required by the "jurisdictional" characterization of the Sixth Amendment right to assistance of

counsel in *Johnson v. Zerbst, supra,* which we discuss below.

■ The other is the argument put forward in *United States v. Whitesel,* 543 F.2d 1176 (6 Cir.1976), *cert. denied,* 431 U.S. 967, 97 S.Ct. 2924, 53 L.Ed.2d 1062 (1977), that the word "counsel" in the Sixth Amendment is not necessarily limited to licensed attorneys. The *Whitesel* court looked to the Judiciary Act of 1789, 1 Stat. 73, enacted just one day before Congress proposed the Bill of Rights to the states, § 35 of which provides:

> *And be it further enacted,* That in all the courts of the United States, the parties may plead and manage their own causes personally or by the assistance of such counsel or attorneys at law as by the rules of the said courts respectively shall be permitted to manage and conduct causes therein.

The court reasoned that "since in the statute the terms 'counsel or attorneys at law' are employed alternatively, it seems probable that the proposers of the Sixth Amendment did not mean to limit representation exclusively to 'attorneys at law.'" 543 F.2d at 1179. This suggestion runs contrary to the holdings of many courts that the term "counsel" as employed in the Sixth Amendment is confined to lawyers admitted to practice in state or federal court. See, e.g., *Achtien v. Dowd,* 117 F.2d 989, 992 (7 Cir. 1941); *United States v. Wilhelm,* 570 F.2d 461, 465 (3 Cir.1978); *Turner v. American Bar Ass'n,* 407 F.Supp. 451, 474–77 (W.D. Wis.1975), *aff'd sub nom. Taylor v. Montgomery,* 539 F.2d 715 (7 Cir.1976) (mem.); *id. aff'd sub nom. Pilla v. American Bar Ass'n,* 542 F.2d 56 (8 Cir.1976); *People v. Cox,* 12 Ill.2d 265, 269, 146 N.E.2d 19, 22 (1957); *People v. Felder,* 47 N.Y.2d 287, 293–94, 418 N.Y.S.2d 295, 297–98, 391 N.E.2d 1274, 1276 (1979). Moreover, conceding the value of an act of the First Congress as an aid in interpreting the Bill of Rights, see Warren, New Light on the History of the Federal Judiciary Act of 1789, 37 Harv.L.Rev. 49, 57 & n. 21 (1923) (five of eight draftsmen of the Act had been members of the Convention), the alter-

native phraseology used in § 35 of the Act of 1789 stems from the English origins of the American legal profession and does not support the unusual interpretation advanced in *Whitesel.*

England's legal profession has always been bifurcated; members of one branch adopt the role of advocate for the party before the higher courts and members of the other branch act as agent on behalf of the party in out-of-court dealings and before minor courts. To use the current terminology, only barristers affiliated with one of the four Inns of Court may plead on behalf of parties in the High Court of Justice, while solicitors advise and act for their clients on most matters outside of court and represent them in minor courts. The names for these two principal divisions of the English legal profession have varied over time. Those with the right of appearance in the royal courts have been called pleaders, serjeants, barristers, and "counsel"; whereas the solicitors of the present day were long known as attorneys. See J. Baker, An Introduction to English Legal History 140–42 (2d ed. 1979).

The American colonies, unable to attract a sufficient number of lawyers educated at the Inns of Court, could not maintain a two-tiered legal profession. The nomenclature, however, persisted through the eighteenth century.

> Invariably, the distinction between advocate and agent—barrister and solicitor (or attorney)—was not, and could not be, maintained in the American colonies, although in some places the various English designations of the lawyer—counselor, barrister, attorney, solicitor, and even that of serjeant . . .—were preserved as titles expressing professional rating, rank, and distinction, rather than different professional activities.

1 A. Chroust, The Rise of the Legal Profession in America xvii (1965).

The two terms employed in § 35 of the Judiciary Act of 1789 reflect this tradition of a bifurcated profession; Congress wished to make sure that members of both branches were accorded the right to appear in

federal courts. While the language of § 35 of the Act of 1789 thus would help to show that an "attorney" satisfies the requirements of the Sixth Amendment even though he was not a "counsel" in the English sense, as seems never to have been doubted, it had no tendency to show that an unlicensed person would qualify as "counsel". Moreover, Congress in its next session adopted the Act of April 30, 1790, 1 Stat. 112, § 29 of which provided:

> [E]very person so accused and indicted for [treason or other capital offences] shall also be allowed and admitted to make his full defence by counsel learned in the law.

The phrase "counsel learned in the law" employed here by Congress in giving effect to the Sixth Amendment, and in equivalent provisions of the right to counsel by the English Parliament[7] and some of the original states,[8] lays to rest any speculation that the phrase "the assistance of counsel" in the Sixth Amendment was meant to signify anything less than representation by a licensed practitioner.

In so construing the original understanding of the term "counsel" we do not intimate that any technical defect in the licensed status of a defendant's representative would amount to a violation of the Sixth Amendment.[9] We limit our decision in this case to situations where, unbeknown to the defendant, his representative was not authorized to practice law in any state, and the lack of such authorization stemmed from failure to seek it or from its denial for a reason going to legal ability, such as failure to pass a bar examination, or want of moral character, e.g., *Huckelbury v. State,* 337 So.2d 400 (Fla.App.1976).

■ There are surprisingly few decisions of the federal courts of appeals dealing directly with the question whether a conviction obtained when the defendant was unknowingly represented by a person thus disqualified from the practice of law must be upset in all cases or whether a court may refuse to disturb the conviction if convinced beyond reasonable doubt that the defendant suffered no harm. Two opinions of the Court of Appeals for the District of Columbia Circuit arose from the representation of defendants in a capital case by an ex-convict bearing the formidable name of Daniel Jackson Oliver Wendell Holmes Morgan. *Harrison v. United States,* 359 F.2d 214, 217 (1965), referred to an action by the court on an earlier appeal from the convictions, wherein, on learning of Morgan's imposture, it first remanded to enable the district court to entertain a motion for a new trial

---

7. When Parliament provided for counsel appointed to assist a defendant accused of treason, it used the term "counsel learned in the law", 7 Will. 3, c. 3, § 1 (1695). When the right to representation was formally extended to all felony cases, Parliament provided that defendants be permitted "to make full answer and defence ... by counsel learned in the law, or by attorney in courts where attorneys practise as counsel", 6 & 7 Will. 4, c. 114, § 1 (1836).

8. See, e.g., New Hampshire, Act of 1791, in Laws of New Hampshire 247 (1792); South Carolina, Act of August 30, 1731, 43 Laws of the Province of South Carolina 518–19 (1736).

   It is true that a century earlier, when lawyers were much more scarce in the new colonies, Pennsylvania's Frame of Government provided that "In all courts all persons of all persuasions may ... personally plead their own cause themselves, or if unable, by their friend", par. 6 (1683), but by 1701 this colony's fundamental law was altered to provide to all "criminals" the "privileges of council", Charter of Privilege, par. 5 (1701).

9. Thus we put aside such cases as where the representative was a member of the bar of another state but had failed to seek admission *pro hac vice,* e.g., *People v. Cornwall,* 3 Ill. App.3d 943, 277 N.E.2d 766 (1971); where he had met all qualifications of learning and character but had failed to take the oath, e.g., *Wilson v. People,* 652 P.2d 595 (Colo.1982); where he had begun representation before the formal admission ceremony took place, e.g., *Ex parte Engle,* 418 S.W.2d 671 (Tex.Cr.App.1967); or where dues requisite to his continued standing had lapsed, e.g., *Johnson v. State,* 225 Kan. 458, 590 P.2d 1082 (1979). We also exclude from consideration, on the ground of waiver, those cases in which the defendant knew of his representative's unlicensed status, e.g., *United States v. Whitesel, supra; United States v. Cooper,* 493 F.2d 473 (5 Cir.), *cert. denied,* 419 U.S. 859, 95 S.Ct. 108, 42 L.Ed.2d 93 (1974); *United States v. Stockheimer,* 385 F.Supp. 979 (W.D.Wis.1974).

and, when defendants declined to make this, vacated the convictions. Apparently this was done without consideration of prejudice, as would be expected in a case where the death penalty had been imposed. On appeal from convictions after a third trial, *Harrison v. United States,* 387 F.2d 203 (1967), *rev'd on other grounds,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), the court reversed one defendant's conviction because of the Government's use, for impeachment purposes, of statements elicited by Morgan from that defendant during the latter's direct examination at the first trial. The court said, 387 F.2d at 212–13:

> Failure to heed the constitutional admonition that the accused enjoy the right to assistance of counsel negates completely the court's jurisdiction to proceed. The proceeding is void, the occurrences therein are vitiated; transpirations otherwise legal go for naught. No less than this was implicit in our disposition of the case shortly after Morgan's deception was uncovered as we had occasion to observe upon the second appeal. (footnotes omitted)

This sounds to us like a *per se* rule, particularly in light of a footnote's citation of *Johnson v. Zerbst, supra,* 304 U.S. at 468, 58 S.Ct. at 1024, discussed below, although Judge Mishler thought it not to be. In *United States v. Merritt,* 528 F.2d 650, 651 (7 Cir.1976), the court directed a new trial in the Northern District of Indiana in a case where counsel had passed the Iowa bar examination but had failed the Indiana examination on three occasions and the court found "several incidents which provide reasonable grounds for questioning counsel's professional judgment and skill" although "[s]tanding alone none of these indictments would lead us to conclude that counsel had not met a minimum standard of professional representation."

The state cases are inconclusive. *People v. Cox, supra,* 12 Ill.2d at 271, 146 N.E.2d at 23, stated that a criminal defendant, in that instance a minor charged with murder who was represented by an unlicensed attorney selected by his mother, must demonstrate that "his conviction was obtained in such a manner as to be offensive to the common and fundamental ideas of what is fair and what is right." However, the court ordered a new trial without any finding of incompetence by Cox's representative. Moreover, the opinion was rendered during the ascendency of *Betts v. Brady,* 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942), which the court cited for the proposition "that the due-process clause of the fourteenth amendment does not incorporate the guarantee of the sixth amendment to the extent that the States are obligated to furnish counsel in every case in which an accused is unable to do so", 12 Ill.2d at 270, 146 N.E.2d at 22–23, a proposition that was to be repudiated in *Gideon v. Wainwright,* 372 U.S. 335, 342, 83 S.Ct. 792, 795, 9 L.Ed.2d 799 (1963), and also relied on the now discredited distinction between retained and appointed counsel which we have discussed above. More recently a unanimous New York Court of Appeals applied a *per se* rule to reverse the convictions of four defendants who had been represented, in some instances as retained and in others as assigned counsel, by a person "who had not completed law school or otherwise satisfied the prerequisites for the practice of law" in any jurisdiction, *People v. Felder, supra,* 47 N.Y.2d at 292, 418 N.Y.S.2d at 296, 391 N.E.2d at 1275.

Application of a *per se* rule appears to us to be required in a case like this by the teachings of the Supreme Court, most notably by the portion of the opinion in *Johnson v. Zerbst, supra,* 304 U.S. at 465–69, 58 S.Ct. at 1023–25, which reversed the ruling below that, whatever the merits of Johnson's claim, it was not cognizable in *habeas corpus.* Justice Black answered that compliance with the assistance of counsel clause of the Sixth Amendment was "an essential jurisdictional prerequisite to a federal court's authority to deprive an accused of his life or liberty", *id.* at 467, 58 S.Ct. at 1024, and thus was within the traditional office of the writ. After recognizing an exception where the right had been waived, he went on, *id.* at 468, 58 S.Ct. at 1024:

> If the accused, however, is not represented by counsel and has not competently

and intelligently waived his constitutional right, the Sixth Amendment stands as a jurisdictional bar to a valid conviction and sentence depriving him of his life or his liberty. A court's jurisdiction at the beginning of trial may be lost "in the course of the proceedings" due to failure to complete the court—as the Sixth Amendment requires—by providing counsel for an accused who is unable to obtain counsel, who has not intelligently waived this constitutional guaranty, and whose life or liberty is at stake. If this requirement of the Sixth Amendment is not complied with, the court no longer has jurisdiction to proceed. The judgment of conviction pronounced by a court without jurisdiction is void, and one imprisoned thereunder may obtain release by *habeas corpus.* (footnotes omitted)

If Justice Black and his concurring brethren in *Johnson v. Zerbst* had been able to foresee the expansion of the writ that was to be engendered by *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), they might not have felt it necessary to pronounce this somewhat surprising thesis that absence of counsel constituted a jurisdictional defect. But pronounce it they did, and the Court has shown no disposition to depart from what they said.

Two subsequent opinions reinforce the clear manifestation from *Johnson v. Zerbst* that harmless error analysis is inapplicable to a case like the present. In "fashioning a harmless-constitutional-error rule" in *Chapman v. California, supra,* 386 U.S. at 22–23, 87 S.Ct. at 827, the Court referred to indications in "our prior cases . . . that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error" and cited in a footnote "*Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (right to counsel)." In *Holloway v. Arkansas, supra,* 435 U.S. at 489, 98 S.Ct. at 1181, the Court went a shade beyond this when it said:

Moreover, this Court has concluded that the assistance of counsel is among those "constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error"

citing *Chapman, supra.*

The conclusion that we must reverse the denial of the motion to vacate Solina's conviction is one that we have reached without enthusiasm on the facts here.[10] It may well be impracticable for the Government to retry Solina 13 years after the event. We know that if Judge Mishler had detected even the slightest possibility that Solina had been prejudiced by Coleman's representation, he would have granted the motion without hesitation. Perhaps, on the other hand, something is to be said for an automatic rule that relieves the courts of the difficult task of making harmless error determinations in lack of counsel cases where the representation is more nearly suggestive of prejudice or the evidence of guilt less overwhelming. Be all this as it may, the question is no longer open to debate in any court save one.

The order denying the motion to vacate the conviction and direct a new trial is reversed with instructions to grant the motion.

---

**10.** Our decision here suggests that prosecutors, trial courts, or both, would do well to make sure that persons representing criminal defendants are duly licensed to practice.