Robert FERRARA, Petitioner,

v.

John KEANE, Superintendent, Sing Sing Correctional Facility, Respondent.

No. 91 Civ. 5871 (CHT).

United States District Court,
S.D. New York.

Nov. 16, 1992.

Julia Pamela Heit, New York City, for petitioner.

David Joseph Mudd, Asst. Dist. Atty., Robert M. Morgenthau, Dist. Atty., New York City (Michael I. Braverman, Asst. Dist. Atty., of counsel), for respondent.

## OPINION

TENNEY, District Judge:

Robert Ferrara ("Ferrara") brings this habeas corpus petition pursuant to 28 U.S.C. § 2254 (1988). Ferrara was convicted in 1982 of murder in the second degree, N.Y. Penal Law § 125.25 (McKinney 1974), by a jury in the New York State Supreme Court, New York County. He was sentenced to a term of imprisonment of twenty-five years to life (Rothwax, J.). Ferrara's petition alleges that the conviction was obtained in violation of his Sixth and Fourteenth Amendment rights to the effective assistance of counsel. For the reasons set out below, the petition is denied.

## BACKGROUND

In September 1982, Ferrara and Robyn Arnold were tried in New York State Supreme Court on charges of murdering Diane Delia on October 7, 1981. Delia was Ferrara's wife and Arnold's former boyfriend before Delia's sex-change. At trial, letters were introduced that Ferrara wrote from jail to prosecution witness Dominick Giorgio which implicated both Ferrara and Arnold in the murder. On October 19, 1982, Arnold was acquitted of all charges while petitioner was found guilty of murder in the second degree.

On November 16, 1982, Ferrara discharged his attorney, Robert Dilts. Under present counsel, petitioner filed a motion to set aside the verdict pursuant to New York Criminal Procedure Law § 330.30, alleging Dilts had provided ineffective representation at trial. On February 16, 1983, Justice Rothwax denied petitioner's motion before imposing a sentence of twenty-five years to life.

On appeal, petitioner challenged the proof of his guilt based on both the sufficiency of the evidence that Delia was dead when Ferrara shot her and the adequacy of his representation by Dilts. On September 30, 1986, the Appellate Division, First Department, unanimously affirmed petitioner's conviction without opinion. *People v. Ferrara*, 123 A.D.2d 527, 506 N.Y.S.2d 501 (1986). On January .6, 1987, the New York Court of Appeals denied petitioner leave to appeal. *People v. Ferrara*, 69 N.Y.2d 745, 512 N.Y.S.2d 1049, 505 N.E.2d 247 (1987).

Petitioner then brought a motion to vacate the judgment pursuant to New York Criminal Procedure Law § 440.10 on the grounds that Dilts was not licensed to practice law in New York State. Justice Rothwax denied the motion on April 29, 1987, and permission to appeal the order was denied later that year. On August 26, 1991, Ferrara filed his present petition for habeas corpus relief.

In his petition to this court, Ferrara seeks relief based on two grounds. Petitioner pleads that he was deprived of his constitutional right to effective assistance of counsel. In particular, petitioner alleges that the deprivation occurred (1) because his trial attorney was not licensed to practice law in this state, (2) because counsel misrepresented that he was so licensed, (3) because counsel's ignorance of New York procedure severely prejudiced petitioner's defense when he failed to move for a *Massiah* hearing, (4) because of counsel's devi-

ation from agreed upon strategy, and (5) because counsel suffered "brown-outs" during trial. Petitioner also pleads that his conviction was obtained in violation of due process because the people failed to prove that Delia was alive when petitioner fired the final two shots intending to kill her. We address each point in turn, below.

## DISCUSSION

### I. *Assistance of Counsel*

■ The applicable standard in determining whether a defendant has been afforded effective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order for counsel's assistance to be found so defective as to require reversal, a defendant must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Id.* at 687, 104 S.Ct. at 2064.

Attorney Not Licensed In New York

■ In some Sixth Amendment contexts involving actual or constructive denials of counsel, prejudice is presumed. *Id.* at 692, 104 S.Ct. at 2067. Petitioner alleges that he was a victim of such a *per se* denial because his attorney was unlicensed to practice law in New York State. In support of his position, petitioner looks to the holding of *Solina v. United States*, 709 F.2d 160 (2d Cir.1983), where the court found that a *per se* violation of the right to counsel had occurred where the defendant's counsel had repeatedly failed the New York bar examination and was not a member of any bar. Here, however, Dilts had been a member of the New Jersey bar for more than 30 years and was well familiarized with general criminal procedure because of his years spent as a county prosecutor. Additionally, according to an affidavit of the prosecutor and the affirmation of the trial judge, Dilts was admitted *pro hac vice.*

Even if this court were inclined to believe that Dilts' petition was flawed, this court will not extend the *per se* rule of *Solina* to find such a violation in a case where an attorney is admitted to a bar other than the forum where he conducted a defense. The language of *Solina* explicitly states that such a holding was not intended. *See* 709 F.2d at 167 & n. 9 (disavowing that any technical defect in licensing would give rise to a *per se* violation and specifically exempting "cases as where the representative was a member of the bar of another state but had failed to seek admission *pro hac vice.*"). Furthermore, the Second Circuit, sitting *en banc*, has recently noted the narrowness of *Solina* and other holdings providing for *per se* violations. *See Bellamy v. Cogdell*, 974 F.2d 302, 303, 306–08 (2d Cir.1992). The court in *Bellamy* stated that such violations were limited only to those cases where counsel, at the time of trial, was not licensed to practice law "because of a failure ever to meet the substantive requirements for the practice of law" or where counsel was implicated in defendant's crimes. *Id.* at 306. Given Dilts' admission to the New Jersey bar, which goes unchallenged here, and the number of years he spent in practice of criminal law, Dilts cannot be said to have failed to have met the "substantive requirements" for the practice of law. As a result, no *per se* violation can be found even if Dilts had not been admitted *pro hac vice.*

Counsel's Alleged Misrepresentation

■ Petitioner also alleges that Mr. Dilts "deliberately deceived" petitioner as to his qualifications by representing that he was indeed a member of the New York bar. In particular, Ferrara alleges that shortly after his arrest, Mr. Dilts was retained by an "unknown benefactor" on his behalf and that Mr. Dilts deliberately deceived his client that he was a member of the New York State bar. Other than his own affidavit, petitioner provides no evidence of the misrepresentation. Nor does petitioner point to any authority which would make such misrepresentation, standing alone, grounds for *habeas corpus* relief even if the allegation could be proven to be true. This court therefore cannot grant relief on the allegation.

Counsel's Failure To Move For A Cardona Hearing

■ Petitioner next alleges that because of Dilts' ignorance of New York law, he

was denied effective assistance of counsel. The gravamen of the allegation is that Dilts failed to request a *Cardona* [1] hearing to determine whether Giorgio was acting as an agent of the state when he elicited information from petitioner about the murder. Had such a hearing been held, petitioner argues, then the "overwhelming evidence" of Giorgio's cooperation would have made him a state agent; therefore, all information acquired by him after petitioner's arrest and acquisition of counsel should have been suppressed in accordance with *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

We begin by noting that the alleged ignorance of state procedures rings hollow with regard to a *Cardona* hearing. The rule of *Cardona* comes from application of *Massiah* to a New York State court proceeding. Indeed, at least one New York court has referred to the procedure as a "Massiah–Cardona hearing." *People v. Branshaw,* 177 A.D.2d 1028, 578 N.Y.S.2d 45 (4th Dept., 1991). No matter what the hearing is called in New York or any other state, the underlying purpose of the inquiry is the same: to discover whether agents of the state acquired post-indictment information from a defendant in violation of that defendant's Sixth Amendment rights. And no court is free to disregard the impact of *Massiah* and its procedural dictates.

It thus strains credulity to suggest that a lawyer who has served as District Attorney for Bergen County, New Jersey in the 1970's would be ignorant of *Massiah. See New Jersey v. Green,* 46 N.J. 192, 215 A.2d 546 (1965), *cert. denied,* 384 U.S. 946, 86 S.Ct. 1475, 16 L.Ed.2d 544 (1966) (applying *Massiah* to a state prosecution). Even if he were unaware of the local name for the proceeding, Dilts almost undoubtedly would know of its availability.

Additional difficulties with the allegation concern the specific findings and rulings made by Justice Rothwax. In his § 330.30 motion to set aside the verdict, petitioner through new counsel requested a *Massiah* hearing and argued that Dilts had been ineffective by failing to request one during the trial. On February 16, 1983, Justice Rothwax denied the motion for the post-trial hearing and specifically held that trial counsel was not ineffective in failing to move for a *Massiah* hearing. This decision appears to be based in part on the exploration at trial of Giorgio's relationship with the police. Because Justice Rothwax made a factual finding that Dilts was not ineffective after hearing the merits of the argument, this court would appear to be barred from granting habeas corpus relief. 28 U.S.C. § 2254(d).

Even without the bar of Justice Rothwax's ruling, this court cannot say that Dilts was ineffective within the meaning of *Strickland.* There is precedent in this circuit and others holding that a habeas petitioner must first show that a suppression motion would have been successful before the prejudice prong of the *Strickland* test is satisfied. *See, e.g., Lopez v. Scully,* 716 F.Supp. 736, 740 (E.D.N.Y.1989) (failure to move to suppress evidence obtained where probable cause existed); *Christian v. McKaskle,* 731 F.2d 1196, 1200–01 (5th Cir. 1984) (failure to move to suppress search warrant affidavit that satisfied the *Aguillar–Spinelli* standard); *see also United States v. DiTommaso,* 817 F.2d 201, 215 (2nd Cir.1987). In this instance, petitioner's contention is analytically the same as an allegation that a defendant's right to effective counsel was violated when counsel failed to undertake suppression of evidence obtained in violation of the Fourth Amendment. Accordingly, petitioner here needs to show that the *Massiah–Cardona* hearing would have succeeded in revealing Giorgio as an agent of the state in order for habeas relief to be granted. Not only has petitioner failed to meet this burden, a review of the record shows he cannot meet it.

Giorgio was Ferrara's close friend. On October 7, 1981, he met Ferrara and Arnold at a luncheonette and heard petitioner ask Arnold if she had "the gun." On two occasions after the murder, Giorgio overheard comments by Arnold that implicated her and Ferrara in Delia's death. At three

---

1. *People v. Cardona,* 41 N.Y.2d 333, 392 N.Y.S.2d 606, 360 N.E.2d 1306 (1977).

different points in January 1982, Ferrara indicated to Giorgio that he had killed Delia. In sum, Ferrara claimed that he, Arnold, and Delia had driven to Rockland County where they stopped their car and walked into a wooded area. Arnold pulled a gun and shot Delia twice in the head and petitioner ran to hide. When petitioner returned to the scene, he took the gun from Arnold and shot Delia twice more to "put her out of her misery." In the third conversation, Ferrara added that he had returned to the site a week later, wrapped Delia's body in a blanket, and thrown the body in the Hudson.

On January 14, 1982, Giorgio was arrested on drug charges in New Jersey. At the New Jersey prosecutor's office, Giorgio was also questioned by New York City police about Delia's murder. Giorgio denied knowing anything beyond what was in the newspapers. Four days later he visited petitioner in the hospital where petitioner was recovering from a suicide attempt. After a subsequent visit to petitioner, Giorgio gave a lengthy statement to the police. New York Detective James O'Neil suggested that Giorgio return to the hospital wearing a tape recorder. However, Giorgio declined. Ferrara was arrested later that day and Arnold was arrested the following day. On January 26, 1982, Giorgio testified before a grand jury about Delia's murder.[2]

After the arrest, Ferrara wrote approximately twenty letters to Giorgio which were delivered to Giorgio's friend, Margaret Van Steenburgh.[3] Giorgio ultimately gave some of these letters to the police.[4] In turn, Giorgio wrote to Ferrara a number of times. In one letter, Giorgio told Ferrara what he had told the police.[5] In another, Giorgio told the petitioner to tell him "what to add" to the description and to send him the "whole story with ... additions."

Petitioner also looks to Giorgio's treatment in his own legal proceedings as evidence of an agency relationship with the state. At Giorgio's sentencing for the January arrest, the prosecutor mentioned Giorgio's cooperation with the New York police in the Delia homicide investigation. However, both the defense attorney and the sentencing judge stated on the record that Giorgio's cooperation was not a factor in the sentence that he received. Giorgio was arrested a second time on March 6, 1982 and sentenced on March 30, 1982, for attempting to smuggle drugs to Ferrara on Riker's Island. Giorgio pled guilty to a lesser offense of disorderly conduct and received a conditional discharge.

In light of the aforementioned facts, petitioner stakes his claim for the necessity of a *Massiah–Cardona* hearing. Petitioner alleges that the police exploited Giorgio's relationship with petitioner by having him elicit statements for the police after petitioner's indictment. Although petitioner concedes that Dilts was able to cross-examine Giorgio as to his relationship with the police, Ferrara asserts that the exploration was not a "full" one because it was not

---

**2.** Giorgio testified that O'Neil told him at the time of his arrest on January 14, that if he lied to the grand jury, he could receive seven years in prison. Tr. at 1125.

**3.** Van Steenburgh testified that sometimes she would discard or first read the letters before giving them to Giorgio when she felt that he might obey petitioner's requests for drugs or for Giorgio to retract his statements to the police. One letter delivered in late February or early March contained another confession by Ferrara. Van Steenburgh testified that she ripped off portions of the letter containing material that she thought Giorgio should not see. She further testified that the ripped-off portions of the letter contained nothing that contradicted the remaining text. The letter was introduced into evidence at trial. For a discussion on the effect of the introduction on trial strategy, see *infra* at pp. 477–478.

**4.** O'Neil knew of the letters and expressed interest in the letters, but Giorgio told him that they had been destroyed. However, two to three weeks before trial, Van Steenburgh and Giorgio delivered five or six letters to the District Attorney. Van Steenburgh delivered one additional letter the following day. Giorgio testified that he thought that he might have delivered one letter "over the summer," but was uncertain.

**5.** Giorgio asked a prison guard at the Bergen County Jail to give the letter to Ferrara. The guard told him that he would photocopy the letter and give the original to the police and the copy to petitioner. O'Neil intercepted the letter on January 23.

undertaken outside of the presence of the jury. But as Justice Rothwax pointed out at the sentencing, the issue was explored, but was in fact an "empty" one.

First, Giorgio refused to wear the microphone suggested by O'Neil before Ferrara's arrest. Second, both the D.A. and Giorgio's attorney stated that Giorgio's cooperation with the police was not to be taken into account in his sentencing for the first arrest in 1982. Third, Giorgio testified that he did not notify O'Neil, Detective Donald Longo (also of the New York Police Department), or the district attorney's office of his second arrest and conviction until after it was concluded. If Giorgio was acting as an agent of the state, he certainly would be expected to look to the state for assistance in the face of a second conviction in one year. Fourth, O'Neil testified that he never requested that Giorgio solicit letters from Ferrara, nor did he again request that Giorgio wear a taping device after January 21, 1982.

In the face of this testimony, Ferrara alleges that a *Cardona* hearing would have revealed an agency relationship. But he can point to no evidence, nor any promising leads that might have been pursued had the hearing been requested. Indeed, the allegations made in the papers for this petition appear to have been rebutted by testimony during the trial. If there were any issues that were needed to be explored which would have more fruitfully suggested an agency relationship, petitioner fails to indicate what those might be or why they could not be explored in front of the jury.

Because the courts "are understandably reluctant to require defense counsel routinely to [make] boilerplate motions merely to vindicate their professional competence without regard for grounds supporting such motions," this court finds that Dilts acted reasonably in not requesting a *Massiah* hearing regarding Giorgio. *DiTommaso*, 817 F.2d at 215. Having failed to show the merits of pursuing such a hearing, peti-

tioner has failed to bring this portion of his claim of ineffective assistance of counsel within the scope of the *Strickland* test. Thus, no relief may be granted on this allegation.

Counsel's Abandonment of a Joint Defense

■ Petitioner next alleges that trial counsel was ineffective because he shared Giorgio's letters to Ferrara with Arnold's counsel in preparation of a joint defense and then abandoned the joint defense at trial. In such attacks on exercises of professional judgment, the court will look to whether counsel could have rationally determined that his client's best interests would be served by employing the chosen strategy; however, the court "will not second-guess trial counsel's defense strategy simply because the chosen strategy has failed." *DiTommaso*, 817 F.2d at 215.

■ In an uncorroborated affidavit, petitioner alleges that he gave Dilts his letters from Giorgio with the understanding that they would not be shown to anyone else. Dilts, however, gave the letters to Arnold's trial attorney, Michael Rosen, presumably to enable the two lawyers to mount a joint attack upon Giorgio's credibility. Although petitioner alleges that such action was in violation of the New York Code of Professional Responsibility, this court need not answer that question.[6] Rather, this court must address whether the change of trial strategy unduly prejudiced the petitioner.

In disputing the change of trial tactics, petitioner ignores the impact of his own letter confessing his guilt to Giorgio. According to Justice Rothwax's decision denying petitioner's motion to set aside the verdict, that evidence did not come forward until after trial began. At the start of trial, the letter was not in the possession of the prosecution or either defense attorney.

The emergence of the letter put Dilts in the position of having to discredit Giorgio and the letter. The letters from Giorgio to Ferrara appear to be the best means of

---

6. Justice Rothwax did find at the sentencing hearing that the letters were not covered by the attorney-client privilege and that Dilts' disclo- sure of them to Rosen was justifiable as a part of a coordinated attack on Giorgio's credibility.

undercutting Giorgio's credibility. This court cannot call irrational the attempt by Dilts to show that petitioner's confession was not meant to be the truth, but merely a statement in response to Giorgio's request for Ferrara to write down what petitioner believed Giorgio told the police.[7]

As to the change from a joint defense to a theory that Arnold alone had committed the murder, such a tactic seems rational in view of the contents of Giorgio's letters. In particular, there were statements that Giorgio loved Ferrara, that he would not hurt Ferrara, that he could not help Ferrara if Ferrara started hating him, that Giorgio would not put his worst enemy in jail except for Arnold and two others, and that Giorgio was working on an alternative plan so that he would not have to testify against Ferrara. With such damaging evidence in existence, and the need to respond to Ferrara's incriminating letter, Dilts faced at least three strategic possibilities. He could maintain the joint defense and attempt to discredit Giorgio without using Giorgio's letters. He could maintain a joint defense and use Giorgio's letters despite the obvious bias that the letters show toward Ferrara. Or he could abandon the joint defense in favor of a theory that Arnold had committed the murder and that Ferrara had shot a dead body and thus reduce Ferrara's charge to a lesser included offense. Under this strategy, the letters would be used to suggest that Giorgio and Ferrara were writing not about what actually happened but what Giorgio told the police. This third option, the one exercised by Dilts, is a rational one when considered against the evidence admissible against Ferrara contained in his letter to Giorgio. Indeed, given the contents of the letter, Dilts appeared to be working in his client's best interests by developing a theory whereby the petitioner might have been convicted of the lesser charge once his fate had been effectively sealed by his own let-

ter. This court therefore concludes that the abandonment of the joint trial strategy did not prejudice the petitioner to the extent that he could be said to have been deprived of the effective assistance of counsel.

Counsel's Alleged "Brown-outs"

Petitioner alleges that Mr. Dilts' performance at trial was possibly impaired by an illness which resulted in Dilts' hospitalization for blackouts at the end of the trial and brown-outs during trial. Petitioner is unable to show any evidence of these "brown-outs" occurring or their effect on his trial. Without more, no relief may be granted on such a bare allegation. See *Hayden v. United States*, 814 F.2d 888, 892 (2nd Cir.1987).

## II. *The Burden of Proof*

Petitioner alleges that while evidence at trial placed him at the scene of the murder, the possibility remained open that petitioner was unaware of his co-defendant's intention to kill Delia, and that when the petitioner fired two shots, he either knew he was shooting a dead body or mistakenly believed Delia was alive. Thus, petitioner contends that the People did not meet the requisite burden of proof to allow for his conviction of murder.

The Supreme Court has held that a state court conviction will not be disturbed on habeas corpus review of the sufficiency of the evidence unless "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979) (emphasis in the original). In this case, the prosecution had the original burden of proving that the petitioner, either as an accomplice or as a principal, killed Delia and that he did so with murderous intent. New York Penal

7. As the district attorney correctly points out in this case, once Dilts had become compelled to rely on these letters during his cross-examination of Giorgio, the letters would have been marked for identification and shown to both Rosen and the prosecution. Furthermore, had Dilts requested the *Cardona–Massiah* hearing

which petitioner now indicates was necessary for his defense, the letters most certainly would have been used to show Giorgio's alleged status as a state agent. Given that the hearing would likely fail, the impact of showing the letters to Rosen appears minimal.

Law § 125.25. This court concludes that this burden was met.

Petitioner's argument springs from the People's theory at trial. There, the prosecution asserted that Ferrara and Arnold planned to kill Delia; they had lured her into the woods in Rockland County where Arnold had fired the first two bullets into Delia's head and Ferrara had fired the second two bullets. In his summation, Dilts argued that Ferrara was not acting in concert with anyone, that petitioner fired the last two shots into Delia's head, and that because medical testimony offered at trial could not establish which bullet had killed Delia, the possibility existed that she was dead when Ferrara pulled the trigger.[8] Now, petitioner argues that because Arnold was acquitted of intentionally killing Delia, Ferrara could not share the requisite intent with Arnold and that the prosecution did not exclude to a moral certainty the hypothesis that Ferrara was in a state of shock when he fired the bullets. Furthermore, petitioner again asserts that the state did not prove that Delia was alive when he fired his shots.

Petitioner's argument is flawed because it is based on the belief that the jury had to believe his account of how Delia died. The jury did not have to believe petitioner's assertion that he ran and hid for a few minutes after the first shots, giving Delia sufficient time to die under the present theory. Nor would the jury need to believe petitioner as to the order and number of shots. Furthermore, alternative theories of what happened—including the theory that Giorgio and Ferrara had conspired to murder Delia—were introduced that the jury might have found believable, particularly after evaluating the credibility of the witnesses.

The evidence offered supports the jury's final conclusion. Petitioner confessed to shooting Delia twice, thinking she was alive so as to "put her out of her misery"; at the time, she appeared to the petitioner to be breathing. On the day of the murder, petitioner was overheard asking Arnold if she had the gun. This evidence, coupled with the circumstantial evidence of petitioner's behavior both before and after the murder,[9] would be sufficient to impute the requisite intent for murder.

As to the matter of proof of Delia's death at the time that Ferrara shot her, petitioner relies heavily on *People v. Dlugash*, 41 N.Y.2d 725, 395 N.Y.S.2d 419, 363 N.E.2d 1155 (1977). In that case the New York Court of Appeals upheld an Appellate Division finding that the evidence did not establish beyond a reasonable doubt that the murder victim was alive when the defendant fired bullets into him. At trial, evidence was introduced that Dlugash had waited two to five minutes after the victim had been shot twice in the chest before Dlugash shot him five times in the face. Dlugash contended that when he fired, the victim already looked dead. Neither prosecution physician witnesses could state with medical certainty that the victim was alive after the initial chest wounds were inflicted. Additionally, defendant produced a physician who testified that wounds like those the victim had suffered in the chest could be almost immediately fatal. Because of the lack of medical certainty, the Court of Appeals affirmed that the People had failed to meet their burden of proof.

This case is factually distinct in a number of ways. Whereas in *Dlugash* there was no doubt that someone shot the victim first, here Arnold contended that she had no part in the murder. Dlugash testified that his victim appeared to be dead; Ferrara's confession indicated Delia appeared to be alive. Finally, Dr. Lydia Perez, the medical examiner who conducted an autopsy on Delia, did testify that there was no way of telling which of the four bullets

---

8. Because of this theory, Justice Rothwax charged the jury with regard to Arnold only with the charge of murder in the second degree. With regard to petitioner, however, Rothwax charged the jury with the lesser included offense of attempted murder in the second degree. Tr. at 1686.

9. After the murder, petitioner stripped his wife of her wedding ring, pawned it, and later returned to the murder sight in order to wrap her body in a blanket and throw it in the Hudson River.

**480**

actually produced death nor which one went in first. Tr. at 335. But the medical testimony in *Dlugash* was given in a factual context where there were two sets of shots at two times with each set fired by different people. Dr. Perez's testimony exists in a context where the time between shots and the number of shooters was in dispute. Because the evidence showed that petitioner had fired at least two of the shots and done so with the belief that the victim was alive and where there was a dispute as to whether petitioner's co-defendant shot the victim at all, there appears to be sufficient evidence for a jury to conclude that Ferrara's gunshots caused Delia's death. The People, therefore, met their burden of proof and defendant was not denied due process.

### CONCLUSION

Ferrara's application for a writ of habeas corpus is denied.

SO ORDERED.