[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 21, 2005
THOMAS K. KAHN
CLERK**

—————————————————

No. 04-10137

—————————————————

D. C. Docket No. 02-14056-CV-KMM

LINDA MICHAEL,

Plaintiff-Appellant,

versus

JAMES CROSBY, Secretary,
Florida Department of Corrections,

Defendant-Appellee.

—————————————

Appeal from the United States District Court
for the Southern District of Florida

—————————————

**(November 21, 2005)**

Before HULL, MARCUS and HILL, Circuit Judges.

MARCUS, Circuit Judge:

Linda Michael, a Florida state prisoner serving a life term of imprisonment

for second-degree murder with a firearm, appeals the district court's denial of her

petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254.[1]  In her

petition, Michael asserted numerous claims of ineffective assistance of counsel

including, <u>inter alia</u>, that her trial attorney, Anthony Natale, was ineffective for

both not discovering and not properly utilizing evidence that Michael suffered

from Battered Spouse Syndrome ("BSS") and Post-Traumatic Stress Disorder

("PTSD"), which would have supported her self-defense claim at trial and

mitigation at sentencing.  She  supplemented her § 2554 petition to include a claim

that the state trial court's imposition of a life sentence was based on

unconstitutional judicial factfinding, in violation of <u>Apprendi v. New Jersey</u>, 530

U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and its progeny.

We granted a certificate of appealability ("COA") on the following issue:

whether the state court's determination that counsel was not ineffective for failing

to provide evidence of PTSD at trial or at sentencing was contrary to, or an

unreasonable application of, clearly established federal law.[2]  Upon thorough

---

[1]Michael filed her petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), and, therefore, the provisions of that act govern this appeal.

[2]Given the scope of the COA, which concerns only the admissibility of PTSD evidence and presentation of a PTSD-based defense, we address only Natale's decision as to the PTSD materials (and the state court's resolution of Michael's ineffectiveness claim based thereon).  <u>See</u> <u>Nelson v. Scholfeld</u>, 371 F.3d 768, 770 n.4 (11th Cir.) (limiting appellate review to those issues specified in the COA), <u>cert.</u> <u>denied</u>, 125 S. Ct. 441 (2004).

review of the record and careful consideration of the parties' briefs and oral

argument, we affirm.

## I.

The relevant facts are these. In 1992, Michael was indicted for first-degree

murder of her ex-husband, having shot him four times and stabbed him four times,

all while their two teenaged children were present in the home. The state habeas

court, which conducted an evidentiary hearing on Michael's Fla. R. Crim. P. 3.850

motion, summarized the evidence presented at trial in these terms:

> The defendant and her husband divorced after approximately 18 years
> of marriage. The divorce was extraordinarily acrimonious. After
> several rounds of hearings, the husband received custody of the two
> children, and Michael was required to pay child support. Over a year
> before the homicide, she left Martin County and moved to Arkansas

---

After granting the initial COA on this issue, we also granted Michael's motion to expand the COA to consider the constitutionality of Michael's sentence in light of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), and the retroactive effect of Blakely on collateral review. Since we granted Michael's motion to expand the COA, the Supreme Court decided United States v. Booker, 543 U.S. ----, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), which expanded Blakely by applying it to the federal Sentencing Guidelines, and, more importantly for our present purposes, we have held that Booker is not retroactively applicable to cases on collateral review. See Varela v. United States, 400 F.3d 864, 868 (11th Cir.) ("Booker's constitutional rule falls squarely under the category of new rules of criminal procedure that do not apply retroactively to § 2255 cases on collateral review."), cert. denied, 126 S.Ct. 312 (2005); see also In re Anderson, 396 F.3d 1336, 1339-40 (11th Cir. 2005) (holding that the Supreme Court has not made Booker retroactively available on collateral review for purposes of authorizing a second or successive § 2255 motion); United States v. Swindall, 107 F.3d 831, 834 n.4 (11th Cir. 1997) (noting application of Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) to collateral challenges to state convictions). Accordingly, we affirm the district court's denial of habeas relief on this issue.

where her parents resided.  On Mother's Day, May 12, 1991, the defendant talked to her son.  After the telephone conversation, she left Arkansas and drove to Martin County, Florida.  On Tuesday, May 14, 1991, at approximately 10:00 p.m., Michael shot and stabbed her former husband, Kenneth Johnson, at his residence after he answered her doorbell ring.

The defendant's trial testimony was that after the conversation with her son, she was upset and wanted to see her children.  She drove approximately a thousand miles and arrived with the erroneous thought that it was Wednesday night, and her husband would be bowling.  She went to the children's neighborhood and looked for them.  When she did not find them outside, she went to the victim's home, and learned that her former husband was home since his vehicle was in the garage.  For reasons which the defendant did not explain, she sliced two window screens before she rang the doorbell.  The former husband answered the door and according to her, stabbed her in the hand.  She shot him with the pistol she had taken from the glove compartment of her car.  Michael and Johnston went through the house to his bedroom with the defendant shooting at Johnston.  Once in the bedroom, she picked up a knife and stabbed Johnston several times.  She left the State of Florida and returned to Arkansas.  Ultimately, [she] surrendered to law enforcement at the Martin County Jail.

The State presented evidence that prior to moving to Arkansas, Michael had made statements in which she expressed a desire to kill her former husband.  The State showed that the stabbing was particularly brutal, and that the former husband had been shot several times.  Her two children were present in the home at the time of the murder, and testified at trial. The impact on the children was related by neighbors and law enforcement officers.  A State witness, Cynthia Simmons, testified that on May 14, 1991, she was on the telephone with Kenneth Johnston at 10:30 p.m., that during the conversation she heard the doorbell ring and Johnston said, "I wonder who that could be at this hour."  Ms. Simmons told Johnston she would wait; she heard the phone being laid down, and five or six seconds later, heard

4

rapid gunfire and Johnston screaming for help. She heard Johnston's voice getting further away from the phone, then heard heeled shoes on a tile floor close by the phone, then heard more gunfire. She did not hear an argument.

Michael did not deny that she killed Johnston, but asserted self-defense. She proffered the testimony of Dr. Caddy, who testified at length as to her past problems with Johnston, which resulted in "learned helplessness." The Court did not admit the testimony.

(emphasis added) (footnote omitted).

As noted by the state habeas court, at trial, counsel sought to present evidence from psychologist Dr. Glenn Caddy, who had examined Michael and concluded that, although there was insufficient evidence of physical abuse to support a BSS-based defense, there was evidence of learned helplessness, as well as evidence symptomatic of PTSD. In addition to Dr. Caddy, two other psychologists, Dr. Mary Ann Dutton and Dr. Sheldon Rifkin, both opined that Michael exhibited symptoms of PTSD. Counsel ultimately sought to introduce Dr. Caddy's diagnosis of learned helplessness, but the state trial court excluded it. The jury convicted Michael of the lesser-included offense of second-degree murder with a firearm.

The sentencing range under the state guidelines was a mandatory minimum sentence of three years' imprisonment to a maximum sentence of twenty-two years' imprisonment. The statutory maximum sentence was life imprisonment.

5

See Fla. Stat. § 782.04(2) (1991) (providing that second-degree murder is "a felony of the first degree, punishable by imprisonment for a term of years not exceeding life"); Fla. Stat. § 775.087 (1991) (providing for enhancement from first-degree felony to life felony where felony involved possession or use of a firearm); § 775.082 (1991) (providing that person convicted of "a life felony committed on or after October 1, 1983, [may be punished] by a term of imprisonment for life or by a term of imprisonment not exceeding 40 years").

In imposing sentence, the state trial judge concluded that, as requested by the state prior to sentencing, an upward departure from the guidelines range was warranted because the murder was excessively brutal and occurred in front of the couple's two children, who the judge noted "were clearly devastated emotionally by finding their father in that condition." Among other findings, the state trial court noted that Michael raised the issue of self-defense and had attempted to assert a diminished-capacity defense. The court found that both of these theories "were disproven by the evidence. The evidence is clear that Defendant went to her ex-husband's home in the dark of night to brutally attack him."

In his sentencing order, the trial judge further stated that he had considered the testimony of Dr. Caddy in support of mitigation, but that an upward departure sentence nevertheless was warranted, given the facts of the case including "the

6

Defendant's excessive use of force, the excessively brutal nature of this homicide, the emotional trauma to the children, the fact that the crime was committed in the children's presence (in the sense that they were in the home and walked in upon the conclusion), and the destruction of the family."

In addition to Dr. Caddy's testimony in support of mitigation, Michael also presented a letter, written for mitigation purposes by Dr. Sheldon Rifkin, at the behest of Michael's trial attorney, Anthony Natale. Rifkin described Michael as "a chronically depressed woman" who "has been under a great deal of stress for a long period of time and whose behavior and actions, in relation to the death of her ex-husband, were definitely affected by these impinging psychological circumstances." Dr. Rifkin continued: "Although not a defense, the data is quite clear and consistent in regard to indicating that her capacities were severely diminished and to an extent that her behavior was greatly influenced and impelled by her extreme sense of despair, hopelessness, and depression."

On direct appeal, Michael raised the following three claims: (1) whether the trial court erred by prohibiting Dr. Caddy's testimony; (2) whether the trial court erred by failing to conduct an adequate competency inquiry; and (3) whether the trial court erred by departing from the guidelines range at sentencing. Michael's conviction and sentence were affirmed on direct appeal. See Florida v. Michael,

654 So. 2d 1173 (Fla. Dist. Ct. App. 1995). Thereafter, Michael moved for rehearing and for certification of a question of great public importance to the Florida Supreme Court, both of which were denied. She also petitioned the Florida Supreme Court for review, which also was denied. Michael then filed numerous pro se motions for rehearing, reinstatement, and correction of an illegal sentence, as well as a pro se motion to correct, mitigate, or modify her sentence under Fla. R. Crim. P. 3.800.

Proceeding with court-appointed counsel, Michael then moved for post-conviction relief under Rule 3.850, raising 32 claims, including that Natale provided ineffective assistance of counsel by failing to use exculpatory evidence in support of a BSS or PTSD diagnosis, failing to conduct an adequate investigation as to a possible BSS-based or PTSD-based defense, and failing to present BSS or PTSD evidence in support of her self-defense claim.

The state habeas court conducted a five-day evidentiary hearing on the Rule 3.850 motion. At the hearing, Natale testified that he had practiced law since 1979, during which time he had handled hundreds of criminal trials, and that he enjoyed a good reputation in the legal community. Natale explained that he agreed to represent Michael after he received a request from Joe Mincberg, who had been Michael's first trial attorney. Mincberg had retained Dr. Keith Haynes, a

8

psychiatrist, to conduct a mental examination of Michael. Dr. Haynes's report, which was presented to the state habeas court at the evidentiary hearing, included details that Johnston had mentally and physically abused Michael.

Ultimately, Mincberg fired Haynes prior to turning the case over to Natale. Natale testified that when he learned of Haynes's involvement, he questioned why Mincberg had not chosen somebody "more forensically inclined." Based on his own extensive experience practicing criminal law in Palm Beach County, Natale did not know Dr. Haynes as "'part of the regular crew' who are forensic psychologists." Indeed, Natale "had no idea who Dr. Haynes was[.]" Natale understood that Mincberg had hired Haynes for a competency analysis. Natale stated that he assumed "if there was something [relevant] that Haynes would have said," Mincberg would have told him at the time the case was transferred. During his testimony, Dr. Haynes's report was presented to Natale who testified that he had not seen the report prior to the 3.850 hearing.

Natale also testified that he was familiar with PTSD but that he did not explore it as a theory of defense in this case because, under the controlling law in Florida at the time, PTSD was not admissible as a theory of defense in a case like Michael's. Instead, he pursued a BSS defense because he believed the brutal

9

manner of the crime indicated a psychological component was at play.[3]  In

furtherance of this defense, Natale retained Dr. Mary Ann Dutton, a nationally

recognized expert in the area of BSS.  Dr. Dutton's evaluation of Michael included

a clinical interview and approximately eight psychological tests.  After her

evaluation, Dr. Dutton  informed Natale that Michael did not suffer from BSS

because Michael had not described a history of significant abuse and, at the time

of the crime, over one year had passed since Michael and Johnston's divorce,

during which time Michael moved over a thousand miles away from Johnston.  Dr.

Dutton opined that Michael did suffer from PTSD "related primarily to the loss of

her children" after the custody dispute.

---

[3] Natale testified at the state habeas hearing that PTSD and BSS were distinguishable, in part, based on the fact that the former required only a single traumatic event, while the latter required a history of such events.  BSS primarily consists of (1) a three-phase "cycle of violence" and (2) a resulting constant depressed mental state, referred to as learned helplessness.  Women in abusive relationships, when suffering from learned helplessness, perceive that there is no alternative or escape from the abusive environment.  See generally Michael Dowd, Battered Women: A Perspective on Injustice, 1 Cardozo Women's Law J. 1 (1993); cf. Hidalgo v. State, 689 So.2d 1142, 1143-44 (Fla. Dist. Ct. App. 1997) (discussing expert's testimony that victim's symptoms indicated learned helplessness, which was a component of BSS; holding that trial attorney's failure to enforce pre-trial exclusionary rule disallowing presentation of "learned helplessness" evidence constituted ineffective assistance of counsel).  As the state habeas trial court noted with regard to the applicability of a BSS defense, "there was no need to aid the jury in this case, in understanding why it was reasonable for the defendant to have remained in a relationship with the victim.  Michael had removed herself from the relationship and the environment, and had lived approximately one thousand miles away for over a year. . . .  The psychological experts could not have testified as to why the defendant remained in the abusive environment, as she did not."

Also in the course of preparing a BSS defense, Natale described how he spoke extensively with Michael about the importance of psychological evidence and impressed upon her the importance of candid disclosure in her interviews with the retained doctors. Michael told Natale that, although there had been some pushing and shoving and Johnston had been emotionally and verbally abusive, there had been no other physical abuse. Thus, Natale stated that Michael never told him or gave him any information that she suffered from physical abuse, despite that Natale told Michael the importance of psychological experts and the possible defense.

Dr. Rifkin, a psychologist appointed by the state trial court to conduct a competency determination, also concluded Michael did not suffer from BSS. However, Dr. Rifkin, like Dr. Dutton, noted that Michael suffered from characteristics suggestive of PTSD.

Natale next hired Dr. Caddy who, after reviewing Michael's file and conducting five interviews, also concluded that Michael did not suffer from BSS. Caddy explained that Johnston's physical abuse was not extreme and did not reach the standard for BSS. Dr. Caddy did opine that Michael exhibited symptoms of PTSD and learned helplessness.

11

At the state habeas hearing, Dr. Caddy testified that from his interviews with Michael he had no information as to a history of actual violence, which was why he did not provide a BSS diagnosis. Dr. Caddy stated that he would have found helpful Dr. Haynes's report from his initial evaluation of Michael (while she was still represented by Mincberg), during which Michael described to Dr. Haynes that Johnston had pointed a gun at Michael's head and pulled the trigger. Michael also told Dr. Haynes that after she caught Johnston in bed with one of their neighbors, Johnston forced her to have sex with the neighbor's husband. According to Dr. Caddy, if he had known about the Haynes report, he would have asked Michael about the foregoing incidents for purposes of diagnosing her with BSS.

Thus, during his testimony at the state habeas proceeding, Natale stated that the experts he retained to evaluate Michael found no evidence of significant physical violence sufficient to support a BSS defense. Natale testified that he could not remember receiving a letter from Michael's neighbor, Lori Reckamp, but that if he had received it, he would have given the letter to one of his experts because the letter contained information about abuse. According to Reckamp's testimony at the state habeas evidentiary hearing, she wrote a letter to Michael while Michael was in prison. In the letter, Reckamp stated that she had seen

Michael with bruises and other injuries on numerous occasions while Michael and Johnston were still married. Natale testified that he would have provided his experts with Dr. Haynes's report, which included Michael's descriptions of instances of physical abuse, as well as Reckamp's letter, for purposes of a BSS diagnosis, if those materials were discovered in the course of his preparation of the defense case.

With respect to the PTSD evidence, Natale stated that, at the time of Michael's trial, PTSD evidence was not admissible in Florida. He acknowledged that there was no question that Michael suffered from PTSD, but stated that he focused on learned- helplessness evidence instead because PTSD evidence was not admissible under Florida law to support a self-defense claim. As for the presentation of Dr. Caddy's opinions, Natale chose to attempt a defense based on learned helplessness, rather than a PTSD-based defense, after Caddy was unable to diagnose Michael with BSS.

Applying the seminal two-pronged test for ineffective-assistance-of-counsel claims found in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the state habeas court denied the Rule 3.850 motion. The court concluded that Natale's attempt to put forth a defense of learned helplessness, rather than PTSD or BSS, was not constitutionally defective, as it did not

13

prejudice Michael. As for Michael's claim that Natale should have discovered and provided Dr. Haynes's report to Dr. Caddy for purposes of making a BSS diagnosis, the state habeas court noted that prior to Natale's representation of Michael, Mincberg discharged Haynes and indicated to Natale that Haynes's report was not helpful. Moreover, the state habeas court highlighted that Natale had in fact retained numerous experts and told those experts that he was pursuing a BSS defense. Each of these experts concluded that Michael did not suffer from BSS.

As for PTSD evidence, the state habeas court noted that Natale described evidentiary and tactical reasons for not presenting such evidence. Natale testified that he thought he would have a better chance of getting Dr. Caddy's expert opinion and diagnosis admitted as to learned helplessness, rather than PTSD. The state habeas court concluded that Michael had not satisfied her burden under Strickland.

The state habeas court found unpersuasive Michael's arguments that if Natale possessed Dr. Haynes's report and the Reckamp letter and provided those materials to the experts he retained, the experts would have returned a BSS diagnosis. In rejecting this position, the court noted that each of the experts retained by Natale independently spent considerable time with Michael, with the

14

goal of diagnosing her with BSS, pursuant to Natale's instructions. Michael told each of the experts about <u>some</u> physical and emotional abuse and also described her family history. Thus, the state habeas court concluded that Haynes's report would not have had the effect Michael attributed to it. On the second prong of <u>Strickland</u>, the state habeas court found that even if it were to assume deficient performance, Michael had not shown prejudice resulting from Natale's representation or, more specifically, his handling of the BSS and PTSD evidence.

Michael appealed the state habeas court's decision and filed additional motions for post-conviction relief. All of her motions were denied, and the appeals affirmed those decisions.

Michael then filed this § 2254 petition in the United States District Court for the Southern District of Florida, raising numerous claims of ineffective assistance of counsel including, <u>inter alia</u>, that Natale was ineffective for failing to submit evidence that Michael suffered from PTSD and for failing to investigate and utilize neighbor Reckamp's letter and Dr. Haynes's report to support a PTSD defense. She supplemented her petition to include a claim that her sentence was unconstitutional because she received an upward departure based on facts not found by the jury.

15

In a Report and Recommendation ("R&R"), the magistrate judge recommended denial of Michael's § 2254 petition. The district court adopted the R&R and denied Michael's petition. Addressing Michael's claim that Natale was ineffective for failing to present a PTSD-based defense, the magistrate judge stated the following:

> . . . Natale testified that he is familiar with PTSD, and that at the time of petitioner's trial, PTSD was not admissible as a defense in and of itself. Natale testified that as he knew the law in the Fourth District Court of Appeal at the time Petitioner's case went to trial, no cases would have permitted PTSD as a self-defense claim. Rather, the only cases that were around at that time allowed a strict BSS defense, or allowed the State to present psychological testimony in support of its case-in-chief.
>
> . . . .
>
> As with BSS, the phenomena of PTSD may not have been factually applicable to her case. PTSD requires (1) a single traumatic event and (2) the person be in a similar traumatic event that triggered a "reliving" of the incident, but there was nothing in her case that factually fit the PTSD defense. Therefore, there is no prejudice from a failure to use PTSD evidence, if it [was] admissible.

R&R at 26-27 (citations omitted). The magistrate judge also noted that under Florida law at the time of Michael's trial, PTSD evidence was not admissible for the purpose of mounting a complete defense.

16

Moreover, even if such evidence was admissible, the magistrate judge concluded that Michael had not shown that Natale's decision to use Dr. Caddy's diagnosis of learned helplessness amounted to ineffectiveness:

> Petitioner also argues that counsel was ineffective for failing to uncover evidence factually supporting the PTSD claim. This Court notes, however, that Natale did have a diagnosis of PTSD; its absence from the trial was the result of a tactical decision not to use it. Natale's unsuccessful attempt to admit the testimony of Dr. Caddy as to "learned helplessness" was instead sound trial strategy in light of the experts' inability to diagnose her with BSS. Such attempt was the only option that Natale had, at least in terms of presenting a psychologically-based defense, to get Dr. Caddy's testimony before the jury. Counsel is given wide latitude in making tactical decisions, and tactical decisions made after a thorough investigation of the law and facts are practically unchallengeable.

R&R at 28. Thus, the magistrate judge found that Michael was not entitled to federal habeas relief. Over Michael's objection to the magistrate judge's recommendation, the district court adopted the R&R and denied Michael's petition. This appeal followed.

## II.

In federal habeas appeals based on claims of ineffective assistance of counsel, we review the district court's findings of fact for clear error and its legal conclusions and mixed questions of law and fact de novo. Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir. 2002); Fugate v. Head, 261 F.3d 1206, 1215 (11th Cir.

17

2001).  In analyzing a § 2254 habeas petition challenging a state court conviction, "both the district court's review and our review is greatly circumscribed and is highly deferential to the state courts."  Crawford, 311 F.3d at 1295.  A habeas petition

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Under § 2254(d)(1), "[a] state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"  Mitchell v. Esparza, 540 U.S.12, 15-16, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405-06, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)).

Moreover, under § 2254(d)(2), a state court unreasonably applies Supreme Court precedent if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413, 120 S. Ct. 1495.  An

unreasonable application also may occur if a state court unreasonably extends, or unreasonably declines to extend, a logical principle from Supreme Court caselaw to a new context. Id. at 407, 120 S. Ct. 1495. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409, 120 S. Ct. 1495. Even if the federal court concludes that the state court applied federal law incorrectly, relief is appropriate only if that application also is objectively unreasonable. Bell v. Cone, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411, 120 S.Ct. at 1495. On habeas review, the factual determinations made by a state court "shall be presumed to be correct." 28 U.S.C. § 2254(e)(1).

III.

Under Strickland, in order to demonstrate that counsel was ineffective, a petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that counsel's deficient performance affected the outcome of the trial. 466 U.S. at 687, 104 S. Ct. 2052. If a defendant fails to make a showing as to

either performance or prejudice, she is not entitled to relief. Id. at 697, 104 S. Ct. 2052. Thus, we need not address the prejudice prong if we find that the performance prong is not satisfied. Turner v. Crosby, 339 F.3d 1247, 1279 (11th Cir. 2003), cert. denied, 541 U.S. 1034, 124 S. Ct. 2104, 158 L. Ed. 2d (2004); Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa." (citation omitted)).

The standard for counsel's performance under Strickland is "reasonableness under prevailing professional norms." 466 U.S. at 688-89, 104 S. Ct. 2052. The reasonableness of counsel's performance is evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential. See Mills v. Singletary, 63 F.3d 999, 1020 (11th Cir. 1995) (citing Kimmelman v. Morrison, 477 U.S. 365, 381, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "objectively unreasonable

20

and falls below the wide range of competence demanded of attorneys in criminal cases." Cross v. United States, 893 F.2d 1287, 1290 (11th Cir. 1990) (citations omitted).

Moreover, "[c]ounsel will not be deemed unconstitutionally deficient because of tactical decisions." McNeal v. Wainwright, 722 F.2d 674, 676 (11th Cir. 1984) (citations omitted); Crawford, 311 F.3d at 1312 ("Deliberate choices of trial strategy and tactics are within the province of trial counsel after consultation with his client. In this regard, this court will not substitute its judgment for that of trial counsel." (quotation marks, internal alteration, and citation omitted)). There is a strong presumption that counsel's performance was reasonable and adequate, with great deference being shown to choices dictated by reasonable strategy. Rogers, 13 F.3d at 386; see also Conklin v. Schofield, 366 F.3d 1191, 1204 (11th Cir. 2004), cert. denied, 125 S. Ct. 1703 (2005). "The presumption of reasonableness is even stronger when we are reviewing the performance of an experienced trial counsel." Callahan v. Campbell, 427 F.3d 897, 933 (11th Cir. 2005).

To overcome this presumption, the petitioner "must establish that no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc)

21

(footnote and citation omitted). Under this standard, there are no "absolute rules" dictating what reasonable performance is or what line of defense must be asserted. Id. at 1317. Indeed, as we have recognized, "[a]bsolute rules would interfere with counsel's independence -- which is also constitutionally protected -- and would restrict the wide latitude counsel have in making tactical decisions." Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001).

IV.

The heart of Michael's argument is that she is entitled to habeas relief because Natale failed to discover PTSD evidence and failed to present a PTSD defense. The decision not to use PTSD evidence, Michael avers, was not a reasonable tactical decision entitled to deference. We disagree.

Although there was psychological evidence that Michael suffered from PTSD, Natale testified that he did not pursue a PTSD defense because it was not available under Florida law in 1992, when the trial took place. Thus, based on the evidence he had, Natale first tried to mount a BSS defense. After retaining numerous experts for that purpose, to no avail, Natale pursued a learned helplessness self-defense claim. The state habeas court concluded that this was entirely consistent with Florida law.

22

"In general, defense counsel renders ineffective assistance when [he] fails to investigate adequately the sole strategy for a defense or to prepare evidence to support that defense." Fortenberry v. Haley, 297 F.3d 1213, 1226 (11th Cir. 2002). Counsel's duty to investigate "requires that counsel 'conduct a substantial investigation into any of his client's plausible lines of defense.'" Id. (citation omitted). In evaluating counsel's investigation, we have held that "counsel need not always investigate before pursuing or not pursuing a line of defense. Investigation (even a nonexhaustive, preliminary investigation) is not required for counsel reasonably to decline to investigate a line of defense thoroughly." Chandler 218 F.3d at 1318 (citing Strickland, 466 U.S. at 690-91, 104 S.Ct. at 2066).

> In this context, evidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims. "Once we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced." Rogers v. Zant, 13 F.3d 384, 388 (11th Cir. 1994).

Callahan, 427 F.3d at 933 (citation and quotation marks omitted; emphasis added).

On this record, we cannot say that the state habeas court's finding that Natale provided reasonably effective assistance under the prevailing norms, was contrary to or an unreasonable application of Strickland. See 466 U.S. at 687-88,

23

104 S. Ct. 2052. As we have outlined above, Natale's trial preparation included investigating numerous potential lines of defense. Despite Michael's repeated denials of a history of physical abuse in her marriage, Natale nevertheless probed from many different angles the viability of a defense theory based on BSS, PTSD, or learned helplessness. His investigation involved, among other things, approximately 19 meetings with Michael, during which he repeatedly impressed on her the importance of psychological evidence to her defense; the retention of three experts specializing in forensic psychology, all of whom he instructed to aim for a BSS diagnosis; and numerous conversations and correspondence with Michael's parents concerning the importance of their involvement in the case for purposes of mounting a defense. Simply put, Natale's investigation of Michael's case and different theories of defense satisfied the Strickland performance standard.

We remain unpersuaded by Michael's argument that PTSD evidence was admissible under Florida law, either at her trial or at her sentencing, and that Natale's performance was ineffective for failing to discover and use such evidence. The cases on which she relies concern the admissibility of PTSD evidence for a purpose other than as a theory of defense. Indeed, many of the cases Michael cited to the district court address the prosecution's use of PTSD

24

evidence in factually distinguishable cases. Cf. Kruse v. Florida, 483 So. 2d

1383, 1385-86 (Fla. Dist. Ct. App. 1986) (concluding that the trial court properly

admitted expert testimony in the prosecution's case-in-chief that the child victim

of a sexual assault suffered from PTSD, so long as testimony was not presented to

directly vouch for the credibility of a witness);[4] see also Ward v. Florida, 519 So.

2d 1082, 1083-85 (Fla. Dist. Ct. App. 1988) (discussing admissibility of expert

PTSD testimony as part of prosecution's case in child sexual abuse case).

Moreover, under Florida law at the time of Michael's trial, not only was

PTSD evidence not admissible as a complete defense, but Florida disallowed a

theory of defense based on diminished capacity or a mental abnormality short of

insanity. See Chestnut v. State, 538 So. 2d 820, 821 (Fla. 1989) (holding that

evidence of abnormal mental condition not constituting legal insanity was

inadmissible to prove that defendant was incapable of specific intent or state of

mind necessary for first-degree murder); Christian v. State, 550 So. 2d 450, 451

(Fla. 1989) (rejecting diminished capacity defense); see also State v. Bias, 653 So.

2d 380, 382 (Fla. 1995) (same). Indeed, at the time of Michael's trial, this Court

---

[4]Under Kruse, Florida law expressly prohibited the use of PTSD to vouch for a witness's credibility. See 483 So. 2d at 1387-88. Although the state habeas court determined that a PTSD-based defense was not permitted under Florida law, we also observe that even if the evidence had been presented, it could not have been used to vouch for Michael's credibility or her version of the events.

25

had held Florida's rule rejecting the diminished capacity defense to negate a specific intent to commit the crime to be constitutional. See Campbell v. Wainright, 738 F.2d 1573, 1582 (11th Cir. 1984).

In short, the state habeas court's analysis of Natale's attempt to present a learned-helplessness defense, was not contrary to, and did not result in an unreasonable application of, Strickland. Natale's testimony at the state habeas evidentiary hearing -- that he made the tactical decision to pursue a learned-helplessness defense rather than BSS (because he did not have a BSS diagnosis) or PTSD (because such a theory of defense was not allowed under Florida law) -- fully supports the state habeas court's rejection of Michael's ineffectiveness claim, pursuant to the first prong of Strickland.

We also reject Michael's arguments that, despite the thorough investigation and preparation of her defense that we have summarized above, Natale was ineffective for failing to discover the Reckamp letter and Haynes report. Natale testified that he had never seen the Reckamp letter prior to the 3.850 hearing. He also said that if he had received the letter (either from Reckamp or Michael), he would have taken further action on it, and that he found it "unusual" that the letter was found in a plastic bag since he does not use plastic bags for non-perishable items. Based on the evidence presented at the 3.850 hearing, the district court

26

observed it "supports the inference that the Reckamp letter may have been deliberately placed in the file years after the trial was completed." In any event, even if the letter was in Natale's file and not discovered, the non-discovery, in and of itself, would not establish deficient performance under Strickland because, based on our own review of the record, there were no "red flags" that would have prompted a reasonable attorney to investigate further for PTSD materials. Cf. Fortenberry v. Haley, 297 F.3d 1213, 1227 (11th Cir. 2002) ("[W]e have held assistance ineffective when counsel ignored 'red flags' that any reasonable attorney would have perceived to demand further investigation." (citing Cunningham v. Zant, 928 F.2d 1006, 1018 (11th Cir. 1991)); see also Rogers v. Zant, 13 F.3d 384, 388 (11th Cir. 1994) ("Once we conclude that declining to investigate further was a reasonable act, we do not look to see what a further investigation would have produced.").

Natale likewise had not seen the Haynes report prior to the 3.850 proceedings. During the testimony of Natale's paralegal/ investigator, Lori Etheridge, Michael's habeas counsel established that the report was in the file at the time of the 3.850 hearing. Natale testified that he did not receive Mincberg's files on the Michael case "until we were sort of more into it." He also described at length his lack of familiarity with Haynes's work, as well as his doubts that

27

Haynes was the best forensic expert for Michael's case, given Natale's experience in defending such cases and knowledge about other more qualified experts. From our careful review of the entire 3.850 proceedings, we simply cannot say, in light of Natale's extensive investigation into various theories of defense, including BSS, PTSD, and learned helplessness, that his failure to discover the Haynes report, even if it was in his possession -- either after Mincberg's files were transferred to his office or after the Haynes report was physically placed in the file in Natale's office -- amounted to deficient performance. In reaching this conclusion, we highlight that Natale described his extensive experience in presenting BSS-based and PTSD-based defenses and also indicated his familiarity with the leading forensic psychologists in the area, three of whom he retained in this case.

Simply put, whether Natale would have been more effective in developing the defense case had he discovered the Reckamp letter or the Haynes report or both, or whether Natale could have done more in investigating Michael's case "is not the question we must answer. Instead, we must look at the representation that [Natale] provided and determine whether it was objectively reasonable, and sufficed to make [Michael's] trial fair." Crawford, 311 F.3d at 1311. We have recognized that counsel has no absolute duty to investigate particular facts or, for

28

that matter, a certain line of defense.  Chandler, 218 F.3d at 1317.  Moreover,

"[c]ounsel is not required to present every nonfrivolous defense; nor is counsel

required to present all mitigation evidence, even if the additional mitigation

evidence would not have been incompatible with counsel's strategy."  Id. at 1319.

Based on our thorough review of the record, any failure to discover the Haynes

report and the Reckamp letter, even assuming they were in Natale's possession

when he was in the process of developing his defense strategy, did not rise to

ineffectiveness under Strickland.

Because Michael has not satisfied her burden on the performance prong of

Strickland, she is not entitled to habeas relief.  The state habeas court's decision

was not contrary to, nor did it involve an unreasonable application of, Strickland.

Moreover, the decision was not based on an unreasonable determination of the

facts in light of the evidence presented in the state court proceeding.  Accordingly,

we affirm.

**AFFIRMED.**