[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12629

_____

D.C. Docket Nos. 1:16-cv-24483-RNS,
1:11-cr-20331-RNS-1


HAFIZ MUHAMMAD KHAN,

Petitioner-Appellant,

versus

UNITED STATES OF AMERICA,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 3, 2019)

Before WILLIAM PRYOR, NEWSOM, and BRANCH, Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

This appeal requires us to decide whether an attorney's disregard of a court instruction to obtain the official consent of a foreign government to conduct video depositions on its soil constitutes ineffective assistance of counsel *per se*. A grand

jury indicted Hafiz Muhammad Sher Ali Khan; two of his sons, Irfan and Izhar Khan; his daughter, Amina Khan; his grandson, Alam Zeb; and his business associate, Ali Rehman, on terrorism-related charges. Khan was charged with conspiring to provide and providing or attempting to provide material support to terrorists, 18 U.S.C. § 2339A, and conspiring to provide and providing or attempting to provide material support to a designated foreign terrorist organization, *id.* § 2339B. Khan and Izhar proceeded to trial. The government dismissed the charges against Irfan, and efforts to extradite Rehman, Zeb, and Amina from Pakistan were unsuccessful. Before trial, Khan moved to depose several witnesses—including codefendants Rehman, Zeb, and Amina—in Pakistan via live video teleconference. The district court granted the motion on the condition that Khan's attorney, Khurrum Wahid, obtain formal permission from the Pakistani government to conduct the depositions. After Wahid failed to obtain that permission, the district court allowed the depositions to proceed anyway. At trial, Khan presented the testimony of Rehman, but the video feed abruptly ended before the other witnesses could testify, potentially because Pakistani officials cut the internet signal. Left without the testimony of these witnesses, Khan testified in his defense. The jury disbelieved him and convicted him on all charges. We affirmed. *United States v. Khan*, 794 F.3d 1288 (11th Cir. 2015). Khan then moved to vacate his sentence, 28 U.S.C. § 2255, on the ground that Wahid's failure to

2

seek formal approval from the Pakistani government constituted ineffective assistance of counsel. The district court denied Khan's motion on the grounds that Wahid's performance was not deficient and alternatively that Khan suffered no prejudice. We affirm.

## I. BACKGROUND

We divide our discussion of the background of this appeal in two parts. First, we provide an overview of the evidence supporting Khan's convictions. Second, we explain the events at trial that form the basis of Khan's claim of ineffective assistance of counsel and the course of later proceedings.

### A.  Khan's Efforts to Support the Pakistani Taliban.

In December 2007, militant Islamist groups in Pakistan united to form the Tehrik-e-Taliban Pakistan, a militant group dedicated to overthrowing the government of Pakistan through violent revolution, establishing Sharia law, and expelling the United States and its allies from Afghanistan. The Pakistani Taliban uses murders, kidnappings, and bombings to perpetrate its jihad against the government of Pakistan and the Western world, and it has killed more than 30,000 Pakistanis through its acts of terrorism. The Pakistani Taliban is closely affiliated with al Qaeda, which provides training, money, and ideological support to Taliban militants. In September 2010, the State Department designated the Pakistani Taliban a foreign terrorist organization.

3

Khan is an imam from the Swat Valley, a region of northern Pakistan near the Afghan border that is a hotbed of Taliban activity and was under the dominion of Taliban forces from mid-2008 to April 2009. Since 1967, Khan has operated a madrassa in his native village in Swat. Khan moved to the United States in 1994, where he became a United States citizen and the imam at a Florida mosque. Notably, in 2009, the madrassa was temporarily closed by the government of Pakistan as a result of its connections with the Taliban.

From 2008 to 2012, Khan collected and sent money to the Pakistani Taliban through his coconspirators, including his codefendants Amina, Zeb, and Rehman. The government's evidence that he had done so consisted primarily of Khan's own words, which were recorded in thousands of telephone calls intercepted by the government under the Foreign Intelligence Surveillance Act, 50 U.S.C. §§ 1801 *et seq.*, and in consensual recordings of conversations with a confidential source. The government also presented financial records of Khan's activities.

The recordings left no doubt about Khan's enthusiasm for the Taliban and terrorism. In one recording, Khan said that he considered the Taliban "the right fix." In another, he stated that "there needs to be an utmost effort . . . that . . . bombings take place" at Pakistani courts applying common law instead of Sharia until "all their traces are erased." Khan said that he wanted to "tear . . . to pieces and soak . . . in blood" "whoever is against the Sharia system!" He called for

4

"Allah [to] bring about a revolution like Khomeini's" Iranian Revolution. Khan also repeatedly praised acts of terrorism. He said that he wished Islamic terrorists would conduct a bombing of the National Assembly of Pakistan comparable to the Taliban's 2008 suicide bombing of the Marriott Hotel in Islamabad. He praised a 2009 attack on New York City carried out by al Qaeda by stating "al-Qaeda people are awesome." When discussing a 2010 attempt by the Taliban to detonate an explosive device in New York City's Times Square, Khan said "[i]t would have been great had it worked out." He singled out one Taliban attack that killed ten Pakistanis for special praise because the victims "[w]ere Christians." Khan celebrated Taliban attacks on American forces in Afghanistan. And he called for the deaths of thousands and prayed for "the Taliban [to be] victorious over" "the whole world."

In conjunction with the financial records, the recordings also established that Khan repeatedly sent money to the Pakistani Taliban and its fighters. Among the militants to whom he sent money was his nephew, Abdul Jamil. Khan described Jamil as "a big agent of Taliban" and a potential suicide bomber. In July 2009, Khan learned that Jamil had been injured while fighting alongside Shah Dauran, the deputy chief of the Swat chapter of the Pakistani Taliban who was known as "the Butcher of Swat." In recorded calls, Khan discussed sending money to Jamil, who was hiding from the Pakistani Army, through his daughter Amina. And on

5

July 16, 2009, Khan sent $900 through his son Izhar via Western Union to Amina in Pakistan, which she delivered to Jamil. The next day, Khan had Irfan wire $500 that they had collected through the mosque to Pakistan. Khan told one donor that her contribution would be sent to "suffering" people in Swat, but he left a voicemail for Izhar telling him the money was "for the Mujahideen." A few weeks later, Amina assured Khan that she had given Jamil 20,000 rupees, and Khan instructed her to give Jamil 30,000 more. Amina later told Khan that Jamil was recovering and was anxious to "return" to action, and Khan responded by telling her that he was working on sending Jamil an additional 10,000 rupees.

Khan also sent money to Noor Muhammad, a wounded Taliban fighter living in Karachi, Pakistan. In November 2009, Khan sent Muhammad 10,000 rupees in coordination with Abdul Qayyum, Zeb, and Muhammad's relative, whose contact information Khan obtained from his son-in-law, Anayat Ullah. Qayyum is the manager of Khan's madrassa in Swat. Khan also assisted the confidential source in traveling to Pakistan in 2010 and suggested that he give money to Muhammad. Khan promised to arrange a meeting between the confidential source and Ullah, who Khan said was connected with Taliban members. On September 23, 2010, Khan told Ullah that his friend, the confidential source, was coming to Pakistan and would give money to the Taliban. On Khan's request, Ullah provided Muhammad's address. The confidential source ultimately

6

traveled to Pakistan and delivered 10,000 rupees to Muhammad in accordance with Khan's instructions. While he was in Pakistan, the confidential source visited Khan's madrassa where he saw a sign that read "Death to America." Khan told the confidential source that children who studied at the madrassa were secretly trained to fight against American soldiers in Afghanistan.

Khan also raised money to aid fighters who were incarcerated by the Pakistani government after the Pakistani Army regained control over Swat from the Taliban in 2009. Amina's son-in-law, Daoud Shah, was one of those fighters. On September 8, 2010, Khan sent $2,990 by Western Union to Qayyum's brother in Pakistan and told the confidential source that $1,500 of that money would go to incarcerated Taliban fighters. Some of that money went directly to Daoud.

Apart from his efforts to support individual militants, Khan sent money to aid the Taliban in its broader mission. In August 2009, Khan promised Amina that he would send her money for "the Shariat people," a term used to refer to those engaged in jihad in support of Sharia law. On August 24, 2009, Khan wired $995 to Pakistan and left his banker a message stating that the money was "for . . . the Mujahideen [and] for the refugees." Khan told Amina and Zeb that they should not give the money to those who are "needy per se," but instead to those who have suffered while doing "Sharia's work." And when trees on Khan's property in Swat

7

were cut and sold to enable the Taliban to widen a road, Khan instructed Rehman to give the proceeds to the Taliban.

Khan also told the confidential source that Rehman withdraws money from Khan's bank account to buy guns for the Taliban. Khan provided Rehman with pre-signed checks to draw funds from his accounts at the National Bank of Pakistan. Rehman cashed $10,000 checks from Khan's account on August 13, 2008, January 22, 2009, and March 25, 2009. And Rehman withdrew $5,000 from Khan's account on November 10, 2010.

## B. *Course of Proceedings.*

In June 2012, Khan's attorney, Wahid, moved under Federal Rule of Criminal Procedure 15 for leave to conduct depositions in Pakistan of Khan's codefendants, Rehman, Amina, and Zeb; unindicted coconspirator Muhammad; and Qayyum. Rule 15 permits a court to grant a motion to conduct depositions "in order to preserve testimony for trial" "because of exceptional circumstances and in the interest of justice." Fed. R. Crim. P. 15(a)(1). Such circumstances exist when (1) the witness is unavailable to testify at trial, (2) their testimony is material, and (3) countervailing factors do not "render taking the deposition[s] unjust to the nonmoving party." *United States v. Ramos*, 45 F.3d 1519, 1522–23 (11th Cir. 1995). Khan argued that because the key defense witnesses all resided in Pakistan and were not subject to the subpoena power of the court, his trial presented the

8

kind of exceptional circumstances that warrant the taking of depositions in a criminal case.

The government opposed the motion on the ground that the depositions would require formal approval from the government of Pakistan and the issuance of letters rogatory. The government also argued that countries like the United Arab Emirates could not serve as third-party locations for the depositions because those countries would not allow Amina, Rehman, Zeb, or Muhammad to testify on their soil on account of those witnesses' alleged ties to the Taliban. Defense counsel responded that Pakistan was the "only place" where the depositions could take place, and that he had already contacted the Pakistani consulate and received notice that letters rogatory were not mandatory. The government countered by pointing out that a deposition in a criminal case had never been taken in Pakistan and the Pakistani government had never received a formal request to conduct such a deposition. The government also underscored that holding depositions in Pakistan could present a serious security risk for American personnel, particularly because security concerns ruled out the United States consulate in Islamabad as a potential location for the depositions.

The district court decided to permit the depositions to be conducted in Pakistan, with prosecutors participating from Miami via video teleconferencing. But the district court instructed defense counsel to submit by December 28, 2012,

9

"evidence . . . showing that the Pakistan government *explicitly* (a) permits these depositions to be held or (b) acknowledges that it is aware of these depositions and that no official deposition is needed for them to occur." The district court also mandated that the depositions be conducted at a facility in Islamabad that would support live, encrypted teleconferencing with three cameras, one showing the witness testifying in Pakistan, one showing the deposition room, and one in the Miami federal courtroom showing the government's attorneys. And the district court insisted on the presence of "one or more Pakistan officials that either alone or together are authorized to administer an oath and verify the identity of the witnesses." The district court stressed that "[t]ime is of the essence" and that there would be "*no more accommodations*."

In an attempt to comply with these conditions, Wahid traveled to Pakistan, interviewed witnesses, performed a test-run video deposition, consulted with a local attorney named Atif Ali Khan, and spoke with the deputy solicitor at the Pakistani Ministry of Law and legal counsel for the Pakistani Ministry of Foreign Affairs. Wahid then filed an affidavit from Atif Khan attesting that he had spoken with officials at the Pakistani Ministries of Law and Foreign Affairs and learned that "since the Government of Pakistan is not a party and these are voluntary depositions . . . no such permission or lack of permission is obtainable from the Government of Pakistan." Wahid also informed the court that he personally spoke

10

with the deputy solicitor at the Ministry of Law and the legal counsel of the Ministry of Foreign Affairs and they "made it clear" that if the government of Pakistan was "not a party," the government did not "care one way or the other" about the depositions occurring on Pakistani soil. According to Wahid, these officials were the same officials that would have reviewed any formal request to conduct the depositions. The officials also told Wahid that defense counsel would not need any permission to conduct voluntary depositions. But Atif Khan's affidavit was clear that the government of Pakistan was not completely indifferent to the depositions taking place in Pakistan, as it stated that United States officials participating in the depositions *would* need permission from the Pakistani government. The government argued that this evidentiary submission was "not in substantial compliance" with the court instruction because it did not "explicitly show that the Pakistan government permits these depositions to be held, and it does not explicitly contain an acknowledgment by the Pakistan government that it's aware of the deposition, [but] no official permission is needed."

The district court expressed concern about Wahid's submission. It explained that the affidavit contained "exactly the kind of ambiguity I was trying to avoid" because it suggested both that no formal approval would be forthcoming and that United States officials would require official permission to participate in the depositions. The district court also asked the government why it had not requested

11

permission from Pakistan, and the government responded it had asked the State Department to send a diplomatic note informing the government of Pakistan about the depositions. For his part, Wahid assured the court that "by all indications, no one over there is going to stop the depositions. If that's the issue, like the Pakistani government is going to march in and shut this thing down, there's no indication of that at all." He added that there was nothing else that could be done to secure permission to conduct the depositions.

Despite its concerns about the ambiguity in the affidavit and its earlier warning that there would be no more accommodations, the district court permitted the depositions to proceed without formal approval from Pakistan. The State Department sent a diplomatic note to the Pakistani government stating that the depositions were scheduled to take place and that the United States would participate by video conference.

As we explained on appeal, "[t]his extensive pretrial and midtrial wrangling was for naught" because "[t]he video-teleconferencing technology worked for all of a day, enabling the defense to call one witness." *Khan*, 794 F.3d at 1309. That witness, Ali Rehman, testified that he opposes the Taliban and instead supports a nonviolent Islamic group called Tablighi Jamaat. He admitted knowing Khan, although he said he had never met him in person. Rehman said that on one occasion, he picked up money sent by Khan and delivered it to Ullah, Khan's son-

12

in-law. This money, Rehman asserted, was not given to the Taliban. Rehman insisted that he only spoke with Khan by phone about the Taliban to tell Khan about the situation in their village, and he said that Khan had him distribute money only to the needy. Rehman denied ever being asked by Khan to purchase guns for the Taliban. The government thoroughly questioned Rehman on cross-examination regarding recorded phone calls in which Khan named Rehman as the man who takes money from his bank account to purchase guns for the Taliban.

The next day, Khan attempted to present the deposition testimony of Noor Muhammad. Muhammad managed to state that he had never fought for the Taliban, but then the live video signal was abruptly lost. Later investigation produced no "conclusive evidence" as to whom had "shut down the depositions," but the district court concluded that "information obtained suggests" that "a branch of the Pakistan government, military, or intelligence services" was to blame. The day after the depositions were disrupted, Khan moved to relocate depositions to the United Arab Emirates, but in the light of the "sensitivity of the relationship between the United States and the [United Arab Emirates]" and evidence establishing that "obtaining visas and permission to take deposition testimony would require significant high-level reviews and communications even before a formal request would be made," the district court concluded that depositions in the United Arab Emirates were "off the table." *Khan*, 794 F.3d at 1310–11 (internal

13

quotation marks omitted). The district court then "presented the defense with an ultimatum: the defense could continue to make efforts to reestablish the Internet connection in Pakistan, but no further continuances would be granted. The trial would move forward" the next week. *Id.* at 1311.

After Wahid failed to restore the internet connection for the depositions, Khan moved for a mistrial, which the district court denied. The defense then decided to call Khan as a witness. Khan vehemently denied supporting the Taliban and testified that he had "no connection with them whatsoever" and that he and those affiliated with his madrassa "hate them." Khan also attempted to offer exculpatory explanations of some of the recorded phone conversations. For instance, he said that in one conversation he referred to Pakistani officials as "faggot pimps" because he was "angry." He denied that he had ever owned a gun or made a bomb and insisted that he had sent money to Pakistan help people in need. But on cross-examination, Khan became irate, badgered the prosecutor, and refused to answer several questions. He proposed that the prosecutor had a "mental problem" and suggested that he go to the hospital. He also commented that he thought the prosecutor's "mind [was] not working" and questioned whether he is really an attorney.

After he was convicted on all charges and we affirmed on appeal, Khan moved to vacate his sentence, 28 U.S.C. § 2255, on the ground that Wahid's failure

14

to obtain formal approval from the Pakistani government for the depositions constituted ineffective assistance of counsel. In support of this motion, Khan produced affidavits from Amina, Zeb, Muhammad, and Qayyum that purport to reflect what their trial testimony would have been if they had been able to testify. Each witness states in his or her affidavit that he or she never supported the Taliban and that Khan never sent money to Pakistan for the purpose of supporting the Taliban.

In a thorough report and recommendation, a magistrate judge concluded that Wahid's actions were not deficient but instead amounted to a "strategic decision to not request official permission because there was a likelihood that such permission would have been denied" by the Pakistani government. The magistrate judge also determined that Khan had failed to establish prejudice because he did not produce any evidence "to suggest that had counsel formally requested approval through the proper channels, that such a request would have been granted," and because the evidence of Khan's guilt was overwhelming. The magistrate judge recommended that the district court deny a certificate of appealability to Khan. The district court granted a certificate of appealability but otherwise adopted the report and recommendation.

15

## II. STANDARD OF REVIEW

"In reviewing a district court['s] denial of a [Section] 2255 petition, we review the court's legal conclusions *de novo* and its factual findings for clear error." *LeCroy v. United States*, 739 F.3d 1297, 1312 (11th Cir. 2014). "A claim of ineffective assistance of counsel is a mixed question of law and fact that we review *de novo*." *Devine v. United States*, 520 F.3d 1286, 1287 (11th Cir. 2008). "The question of whether a decision by counsel was a tactical one is a question of fact," *Bolender v. Singletary*, 16 F.3d 1547, 1558 n.12 (11th Cir. 1994), but "[w]hether the tactic was reasonable . . . is a question of law and is reviewed *de novo*," *Collier v. Turpin*, 177 F.3d 1184, 1199 (11th Cir. 1999).

## III. DISCUSSION

A familiar framework governs claims of ineffective assistance. *See Strickland v. Washington*, 466 U.S. 668 (1984). To prove ineffective assistance of counsel within this framework, a movant must establish that "'counsel's performance was deficient,' meaning it 'fell below an objective standard of reasonableness'" and "'the deficient performance prejudiced the defendant.'" *Gordon v. United States*, 518 F.3d 1291, 1297 (11th Cir. 2008) (quoting *Strickland*, 466 U.S. at 687–88). In the light of the "strong presumption" that counsel's actions fall within the wide range of constitutionally adequate assistance, a movant "must establish that no competent counsel would have taken the

16

[challenged] action." *Chandler v. United States*, 218 F.3d 1305, 1314–15 (11th Cir. 2000) (en banc); *see also Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (explaining that courts must give great deference to "choices dictated by reasonable trial strategy" when evaluating claims of ineffective assistance).

We divide our discussion in two parts. First, we explain that Wahid's decision to forgo formal approval from the Pakistani government did not constitute deficient performance. Second, we explain that Khan failed to prove prejudice.

### A.  Wahid's Performance Was Not Deficient.

Khan argues that Wahid's failure to comply with the district court's instruction to obtain formal permission from the government of Pakistan in itself amounted to deficient performance on the theory that noncompliance with instructions contained in a court order is *per se* deficient, but this theory cannot be squared with *Strickland*. There the Supreme Court expressly declined to formulate "specific guidelines" that would "exhaustively define the obligations of counsel" and instead adopted a test that asks "whether counsel's assistance was reasonable considering all the circumstances." 466 U.S. at 688. This totality-of-the-circumstances standard reflects the reality that "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688–89.

17

Supreme Court precedent makes clear that the totality-of-the-circumstances approach mandated by *Strickland* precludes the development of subsidiary categorical rules to facilitate the application of the reasonable-performance standard. *See Cullen v. Pinholster*, 563 U.S. 170, 195–96 (2011) (holding that "[t]he Court of Appeals erred in attributing strict rules to this Court's recent case law" because it adopted the principle that '[i]t is prima facie ineffective assistance for counsel to abandon[] their investigation of [the] petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources" (citation and internal quotation marks omitted)); *Roe v. Flores-Ortega*, 528 U.S. 470, 478 (2000) (rejecting the First and Ninth Circuit's "bright-line rule" that failing to "file a notice of appeal unless the defendant specifically instructs otherwise" is "*per se* deficient" as "inconsistent with *Strickland*'s holding that 'the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances'" (quoting *Strickland*, 466 U.S. at 688)). These decisions leave little doubt that "[t]he Supreme Court has definitively rejected any per se rules for adjudicating claims of ineffective assistance of counsel." *Harrington v. Gillis*, 456 F.3d 118, 126 (3d Cir. 2006).

We too have repeatedly rejected *per se* rules of ineffective assistance. *See Gordon*, 518 F.3d at 1300–01 (holding that counsel's failure to object to the absence of inquiry about the right to allocute does not amount to ineffective

18

assistance *per se*); *United States v. Pease*, 240 F.3d 938, 941–42 (11th Cir. 2001) (holding that counsel's reliance on defendant's representations as to criminal history and failure to run a criminal records check is not "per se deficient performance"); *Bertolotti v. Dugger*, 883 F.2d 1503, 1511 (11th Cir. 1989) (holding that counsel's failure to request mental-health examination "cannot be *per se* deficient"). We now make explicit what these decisions left implicit: that *Strickland*'s totality-of-the-circumstances test for deficient performance cannot be substituted with *per se* rules of deficiency.

Some of our sister circuits have adopted "a *narrow* per se rule of ineffectiveness where a defendant is, unbeknownst to him, represented by someone who has not been admitted to any bar based on his 'failure to ever meet the substantive requirements for the practice of law.'" *United States v. Bergman*, 599 F.3d 1142, 1148 (10th Cir. 2010) (quoting *Solina v. United States*, 709 F.2d 160, 167 (2d Cir. 1983)); *see also United States v. Mitchell*, 216 F.3d 1126, 1132 (D.C. Cir. 2000); *Harrison v. United States*, 387 F.2d 203, 212 (D.C. Cir. 1967), *rev'd on other grounds*, 392 U.S. 219 (1968). But the reasoning of these decisions does not actually support a *per se* rule of ineffectiveness; it instead supports a rule that a person not admitted to practice law does not qualify as "counsel" within the meaning of the Sixth Amendment.

19

In *Bergman*, the Tenth Circuit followed the lead of Judge Friendly's opinion in *Solina*, which adopted a *per se* rule that mandates reversal if a defendant was—unbeknownst to him—represented by counsel never admitted to the practice of law because "the phrase 'the assistance of counsel' in the Sixth Amendment was meant to signify . . . representation by a licensed practitioner." *Solina*, 709 F.2d at 167. In *Harrison*, the District of Columbia Circuit endorsed the same rule on the ground that the demands of the Sixth Amendment "are not satisfied when the accused is 'represented' by a layman masquerading as a qualified attorney." 387 F.2d at 212. Neither *Solina* nor *Harrison* articulates its holding in terms of ineffective assistance of counsel, and with good reason. *See Solina*, 709 F.2d at 168–69; *Harrison*, 387 F.2d at 212–13. Setting aside the Supreme Court's prohibition on *per se* rules in this context, a categorical rule of ineffective assistance of counsel could only be rationally justified if "the 'deficient performance' standard of an ineffective assistance claim" will "always be satisfied" by commission of the alleged error, and the occurrence of the error always "satisf[ies] the 'prejudice' standard of an ineffective assistance claim." *Gordon*, 518 F.3d at 1300. But it would make little sense to suppose that it is *impossible* for one who is not a licensed attorney to render legal services that satisfy both elements of the *Strickland* test. Indeed, *Solina* observes that the specific allegations of ineffectiveness asserted by the movant were "a long way from establishing that

20

[Solina's unlicensed trial counsel] did not furnish . . . reasonably competent representation" and that "nothing in the record supports a belief that a lawyer licensed to practice in every state of the Union could have presented a case that should have induced a rational juror to harbor a reasonable doubt about Solina's guilt." 709 F.2d at 164.

As a result, we conclude that neither *Solina* nor *Harrison* purports to establish a *per se* rule of *ineffective assistance* of counsel. Instead, those decisions hold that a defendant who was unknowingly represented by an unlicensed practitioner has sustained a "total deprivation of the right to counsel at trial," *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991), because an unlicensed practitioner does not qualify as "counsel" within the meaning of the Sixth Amendment, *see Solina*, 709 F.2d at 167 (an unlicensed practitioner is not "counsel" under "the original understanding of the term 'counsel'"); *Harrison*, 387 F.2d at 212 (holding that "so precious a right" as the right to counsel cannot "be entrusted to one who has not been admitted to the practice of the law"). The Tenth Circuit was mistaken in describing this rule as a "per se rule of ineffectiveness." *Bergman*, 599 F.3d at 1148.

This appeal, of course, does not require us to decide whether this rule rests on a satisfactory account of the "original understanding of the term 'counsel,'" *Solina*, 709 F.2d at 167, as there is no suggestion that Wahid was unlicensed. But

21

this exegesis of the reasoning of *Solina* and *Harrison* reveals that the tension between the rule of those decisions and the holding that *Strickland* precludes the development of *per se* rules of ineffectiveness is not genuine. *Harrison* and *Solina*, properly understood, do not adopt a rule of *per se* ineffectiveness at all. Because Khan's proposed *per se* rule is foreclosed by Supreme Court precedent, we must determine whether Wahid's performance was deficient through a straightforward application of *Strickland*.

Under the objective standard of reasonableness established in *Strickland*, Wahid's decision to disregard the court instruction to obtain formal approval constituted a "choice[] dictated by reasonable trial strategy." *Crosby*, 430 F.3d at 1320. Wahid was in uncharted territory. A deposition in an American criminal case had never been taken in Pakistan, nor had any formal request to conduct such a deposition ever been made to the Pakistani government. And there was no meaningful alternative to conducting the depositions in Pakistan. Codefendants Amina, Zeb, and Rehman faced arrest if they traveled to the United States to testify, and third parties like the United Arab Emirates would not permit those witnesses or Muhammad—a suspected Taliban fighter—to testify on their soil.

Nevertheless, Wahid made significant efforts to secure permission to conduct the depositions. He traveled to Pakistan and consulted with Pakistan's deputy solicitor at the Ministry of Law, legal counsel for the Pakistani Ministry of

22

Foreign Affairs, and Atif Khan—an experienced Pakistani attorney. According to Wahid's uncontroverted statements to the district court, what he learned through his investigation was that obtaining official permission would be difficult, if not impossible. The officials he spoke with informed him that because "the Government of Pakistan is not a party and these are voluntary depositions . . . no such permission or lack of permission is obtainable from the Government of Pakistan." Wahid's account of the difficulties attendant to any attempt to secure the cooperation of the Pakistani government was corroborated by other evidence at trial. John Bangert, an special agent with the Federal Bureau of Investigation stationed at the United States embassy in Islamabad, stated in a pretrial hearing that to the best of his knowledge, the United States had "never been granted direct access to a Pakistani national [who] is under indictment or wanted by the United States" to conduct a deposition on Pakistani soil.

Khan argues that Wahid acted unreasonably by failing to pursue letters rogatory, but he offers no reason to think that such pursuit would have been successful. Letters rogatory "rest entirely upon the comity of courts towards each other." 22 C.F.R. § 92.54. But as the government explained at trial, diplomatic relations between the United States and Pakistan are "not an easy area to navigate in." As the magistrate judge explained, "it is entirely possible that had counsel

23

requested official permission from Pakistan" through formal channels, "such a request would have been denied."

Even if the Pakistani government had been willing to grant formal permission through letters rogatory, it is unclear whether the execution of those letters could have occurred within the timeframe mandated by the district court. The district granted Khan's motion to conduct depositions under Rule 15 on November 2, 2012 and instructed the defense to obtain the explicit approval or acknowledgment of the Pakistani government by December 28, 2012. But the execution of letters rogatory may have taken a year or more. *See* U.S. Dep't of State, *Preparation of Letters Rogatory*, https://travel.state.gov/ content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/obtaining-evidence/Preparation-Letters-Rogatory.html (last visited June 25, 2019). With trial scheduled for January 3, 2013, and in the light of the district court's warning that there would be "*no more accommodations*," one cannot say that letters rogatory clearly constituted a viable alternative means of obtaining the testimony of the witnesses.

Although there was no sign that formal approval could be obtained, Wahid had reason to believe that no formal approval was necessary. According to Wahid's uncontroverted testimony, the officials with whom he spoke "made it clear" that if the government of Pakistan was "not a party," they did not "care one

24

way or the other" about the depositions occurring on Pakistani soil. Wahid also attested that these officials were the same officials who would have reviewed any formal request to conduct the depositions. The officials also apparently told Wahid that defense counsel would not need any permission to participate in voluntary depositions. Although those officials explained to Wahid that United States personnel would need permission to participate in a deposition in Pakistan, it was at least possible, in the light of what was known at the time, that this hurdle could be overcome. The district court requested that the United States seek permission to participate, and the Pakistani government could well have taken a request from the United States government more seriously than Wahid's efforts. And there was a chance that the Pakistani government's request that the United States obtain permission would not even apply because the United States was slated to appear only via video teleconference. After all, Atif Khan's affidavit stated that this requirement would apply only if United States personnel participated in the "depositions *in Pakistan*," and it was not clear whether this requirement would come into play if United States officials did not appear on Pakistani soil to conduct the depositions. Indeed, Wahid informed the court that the deputy solicitor at the Ministry of Law had told him that he "wasn't even sure" whether the United States would need permission to participate if it was only doing so via video teleconference "because it's a new thing."

25

In this circumstance, Wahid's decision to forgo further attempts to obtain formal approval or acknowledgment from the Pakistani government was reasonable under *Strickland*. With no ready means of obtaining formal approval, Wahid had two options: he could either admit defeat and inform the district court that he could not comply with the instruction to obtain formal permission at all or attempt to convince the district court to allow him to proceed without formal permission. Wahid opted for the latter strategy, and this strategy was successful in two respects: (1) he convinced the district court to permit the depositions to go forward in the absence of formal authorization, and (2) Rehman, through whom Khan passed $35,000 of the alleged $46,000 he sent to the Taliban, was ultimately able to testify from Pakistan. If Wahid had simply admitted defeat, it was a certainty that the depositions would not have gone forward at all.

Indeed, further attempts to secure formal approval could well have been worse than futile. It was entirely possible that Pakistan would have denied any such request, and as the magistrate judge explained, "it was possible that if the Pakistani government expressly denied the request for depositions, that the opportunity to present the witness' testimony would have been foreclosed." So it was reasonable for Wahid to conclude that attempting to comply with the court instructions would have jeopardized his client's interest more than the strategy he ultimately adopted, even though Wahid was of course running the risk that the

26

district court would rescind its order permitting the depositions for failure to substantially comply with its conditions for granting that order. As a result, Khan has not overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" because—in this circumstance—disregarding the district court's instructions constituted "sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and internal quotation marks omitted).

Khan responds that Wahid's decision breached his duties as an officer of the court because he disregarded a court order, but we disagree. The district court did not impose a *duty* on Wahid to seek official approval or acknowledgment of the depositions from the Pakistani government. Instead, the district court granted the motion for depositions under Rule 15 subject to the "condition[]" that Wahid would submit "evidence . . . showing that the Pakistan government *explicitly* (a) permits these depositions to be held or (b) acknowledges that it is aware of these depositions and that no official permission is needed for them to occur." The probable consequence of failure to comply with this condition was that the district court would rescind its order granting the motion to conduct depositions in Pakistan. In other words, Wahid did not disregard an affirmative duty imposed by court order. Instead, he failed to comply with a condition, and in doing so imposed a risk on Khan that the district court would rescind its order granting the depositions. But because it was unlikely that Wahid would have been able to

27

obtain formal permission from the government of Pakistan, he reasonably accepted this risk.

Even if we were to assume that Wahid's conduct constituted a breach of his duty to obey court orders, Khan's argument would not establish that Wahid provided inadequate representation because it conflates that duty to the court with the duty to provide effective representation to a client. We have explained that it is a "fundamental proposition" of law that "orders of the court '*must be obeyed* until reversed by orderly review or disrobed of authority by delay or frustration in the appellate process . . . .'" *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1208 (11th Cir. 1985) (quoting *United States v. Dickinson*, 465 F.2d 496, 509 (5th Cir. 1972)). "Parties and counsel alike are bound by this admonition." *Id.* And this duty is inscribed in the American Bar Association's Model Rule of Professional Conduct 3.4, which prohibits attorneys from "knowingly disobey[ing] an obligation under the rules of a tribunal" except through "an open refusal based on an assertion that no valid obligation exists." Model Rules of Prof'l Conduct r. 3.4(c) (Am. Bar Ass'n 2019 ed.); *see also Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (The guidelines of the American Bar Association are "evidence of what reasonably diligent attorneys would do," but are not "inexorable commands.").

But the duty to obey court orders is a duty owed *to the court* distinct from the duty to provide effective assistance, which runs *to a client* under the Sixth

28

Amendment. A lawyer's duty to provide effective representation is the correlate of a defendant's right to counsel under the Sixth Amendment. *Cf.* Wesley Newcomb Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning*, 23 Yale L.J. 16, 33 (1913) ("[A] duty is the invariable correlative of that legal relation which is most properly called a right."). This right is violated by "failing to render 'adequate legal assistance'" to a client, *Strickland*, 466 U.S. at 686 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980)), not by the breach of a duty owed to the court, except insofar as the conduct constituting the breach of such a duty *also* constitutes a breach of the duty to provide adequate legal assistance. It follows that there is no immediate inference from the breach of a court order to the breach of the duty to provide effective representation.

As the Third Circuit has explained, "[i]f counsel breaches a duty *to the court*, this does not necessarily mean that the representation of *his client* was ineffective. Assuming that [the attorney] did violate some ethical duty to the court that would warrant disciplinary sanctions *against him*, that breach would provide no justification for a remedy that would, in effect, impose a sanction *upon the government*." *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1438 (3d Cir. 1996). And although Khan argues that "[c]haracterizing willful noncompliance with a court order as trial strategy [would] set a bad precedent for future attorney performance" and would "undermine[] the authority of district courts," we agree

29

with the Third Circuit that it is more likely that "overturning a conviction in a situation of this kind on the basis of counsel's breach of an ethical duty to the court would create a perverse incentive for defense counsel to 'build in' reversible error by violating their duties as officers of the court." *Id.*

To be sure, disregarding a court order is not ordinarily "sound trial strategy," *Strickland*, 466 U.S. at 689 (citation and internal quotation marks omitted), nor is it ordinarily appropriate for counsel to fail to comply with court-imposed conditions when the defendant's ability to conduct depositions of material witnesses under Rule 15 hangs in the balance. But when the expected costs of any adverse consequences to the representation of a client resulting from noncompliance with court instructions are outweighed by the expected benefits of noncompliance, it cannot be said that "no competent counsel would have taken the [challenged] action." *Chandler*, 218 F.3d at 1315. At a minimum, the noncompliance of counsel cannot be faulted when it is impossible to satisfy a court order or comply with a condition—in such a circumstance, counsel ordinarily cannot even be held in contempt for violating a court order. *See Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 799 F.2d 1510, 1521 (11th Cir. 1986) ("A party held in contempt may defend his failure to obey a court's order on the grounds that he was unable to comply."). And if counsel reasonably believes that compliance with a court order is impossible, the best course of action might be to forgo attempts at compliance and

30

focus on persuading the district court to accept some substitute for compliance, which is all Wahid did here.

Khan also argues that the facts of this appeal are analogous to a circumstance in which "trial counsel decided that instead of using the subpoena power of the court, he would just invite witnesses to testify because it is much friendlier and less costly than issuing formal subpoenas," but this analogy is strained at best. As we have explained, Wahid did not have any obvious method of obtaining formal permission from the Pakistani government. So, in reality, the proper analogue for this appeal would be a circumstance in which counsel had no sure means of compelling testimony at all. In that circumstance, one could not fault counsel for relying on whatever legally permissible means he had at his disposal to present the relevant testimony.

The decisions Khan cites in support of his argument are poles apart from this appeal, in that they uniformly involved circumstances in which defense counsel utterly failed to investigate potential witnesses or secure their testimony. *See Goodman v. Bertrand*, 467 F.3d 1022, 1029–30 (7th Cir. 2006) (failing to subpoena a key defense witness because counsel erroneously assumed that the government would call the witness was not a reasonable "tactical" decision); *Fortenberry v. Haley*, 297 F.3d 1213, 1230–31 (11th Cir. 2002) (holding that counsel was ineffective because "counsel did not interview or prepare a single

31

witness prior to the [sentencing] hearing" and the sole defense witness "had no idea why he was testifying"); *Washington v. Smith*, 219 F.3d 620, 629–30 (7th Cir. 2000) (holding that counsel was ineffective for waiting until the second day of trial to subpoena a witness listed by the defense as the defendant's sole alibi witness and did not show even "minimal diligence in trying to secure" the testimony of the witness); *Code v. Montgomery*, 799 F.2d 1481, 1483–84 (11th Cir. 1986) (holding that counsel was ineffective when he knew the defendant's "exclusive defense was based on an alibi" but never asked the witness he erroneously believed could provide an alibi whether she could corroborate it, made no attempt to subpoena the witness, and did not investigate other potential alibi witnesses).

In contrast with the deficient efforts of counsel recounted in these decisions, Wahid's performance in the trial underlying this appeal seems almost herculean. He traveled to Pakistan, consulted with a Pakistani attorney and Pakistani officials, interviewed multiple witnesses, convinced the district court to permit depositions on Pakistani soil without the explicit consent of the Pakistani government, and presented the testimony of one witness in Pakistan in spite of the difficult diplomatic situation between the United States and Pakistan and the unprecedented nature of the depositions. As a result, we conclude that the district court correctly ruled that Wahid's performance was not deficient.

32

## B.  Khan Failed to Prove Prejudice.

Khan's challenge fails for another reason: he has failed to prove prejudice. To prove prejudice under *Strickland*, a movant must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. This standard contains a "critical requirement that counsel's deficient performance must actually cause" the prejudice asserted by the movant. *Flores-Ortega*, 528 U.S. at 484.

Khan has made no effort to prove that if Wahid had formally requested approval from the Pakistani government for permission to conduct the depositions, the request would have been granted. Khan did not produce any affidavit from the Pakistani government attesting what procedures should have been used to obtain permission for the depositions, and that if these procedures had been followed, permission would have been granted. Nor did he produce any other evidence to establish a causal link between Wahid's decision to forgo formal approval and the failure of the depositions. His only attempt to establish this causal connection in his brief consists of a single conclusory assertion that "[i]f trial counsel had gone through the proper channels, as he was repeatedly ordered by the district court to do, the testimony of all of those witnesses would have been preserved and able to be presented to the jury." Indeed, Khan's brief concedes that "seek[ing] compelled

33

testimony through the proper mechanisms" "may not have guaranteed the witnesses' compliance or the Pakistani government's cooperation."

"[A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. Khan's conclusory assertion does not suffice to discharge this burden, particularly in the light of the uncontroverted record evidence establishing that the Pakistani government would likely have denied any formal request for authorization. Again, Wahid's uncontroverted statement at trial was that the Pakistani officials he spoke with—apparently the same officials who would have reviewed any formal request—told him that the government would not grant explicit permission to conduct the depositions. A deposition had never been conducted on Pakistani soil before, and the government had never obtained Pakistani consent to "direct access to a Pakistani national [who] is under indictment or wanted by the United States" in the past. So we agree with the magistrate judge's assessment that there is "plainly no indication, from the record or otherwise, that counsel would have been able to obtain the explicit permission had it been requested." And Khan's failure to prove a causal connection between Wahid's decision to disregard the district court's discussion and the failure of the deposition witnesses to testify is fatal to his claim. *See Flores-Ortega*, 528 U.S. at 484.

34

But even if we were to grant Khan's unsubstantiated contention that the Pakistani government would have provided official approval if a formal request had been made, Khan has still failed to establish prejudice. To describe the evidence of Khan's guilt as "overwhelming" would be an understatement. *See Bates v. Sec'y, Fla. Dep't of Corr.*, 768 F.3d 1278, 1300 & n.9 (11th Cir. 2014) (explaining that "overwhelming evidence" of guilt "makes it obvious" that the movant "cannot show *Strickland* prejudice"). The recordings left no doubt that Khan supported the Pakistani Taliban, terrorism, and jihad. He said that he wanted to "tear . . . to pieces and soak . . . in blood" "whoever is against the Sharia system!" He called for an Islamist revolution in the mold of Khomeini's. He praised terrorist attacks and celebrated violence against Americans and Christians. He prayed for the deaths of thousands and for "the Taliban [to be] victorious over" "the whole world." And together with the financial records, the recordings established that Khan translated his ideological enthusiasm into concrete acts of material support for terrorism. He sent money to Jamil, Muhammad, and Daoud, all of whom, Khan said, were mujahideen. Under the pretense of accepting charitable donations for the needy in Swat, Khan raised money that he admitted was actually "for the Mujahideen." And he had Rehman withdraw $35,000 from his bank account for the purpose of, according to what he told the confidential source, enabling the Taliban to buy guns.

35

The testimony of Amina, Zeb, and Muhammad—as reflected in the affidavits they submitted in support of Khan's motion to vacate—would not have put a dent in the government's case. The affidavits attest that each witness would have testified that he or she is not a supporter of the Pakistani Taliban, that the money sent by Khan was given to the needy, used for personal expenses, or used to support the madrassa, and that Jamil, Muhammad, and Daoud were not members of the Taliban. It is extremely difficult to imagine that the bare denials of involvement with terrorism proffered by these witnesses—two of whom were close relatives and codefendant fugitives from justice—could have negated the government's powerful case, the bulk of which derived from Khan's own words. So "even had the witnesses' testimony been presented to the jury, the verdict would have remained the same," which precludes the conclusion that Khan was prejudiced by the inability of these witnesses to testify at trial. *United States v. Andrews*, 953 F.2d 1312, 1327 (11th Cir. 1992). So we conclude that Khan has failed to establish that his trial counsel was ineffective under *Strickland*.

## IV. CONCLUSION

We **AFFIRM** the denial of Khan's motion to vacate his sentence.

36